# Illinois Official Reports

## Appellate Court

---

### *People v. Hampton*, 2021 IL App (5th) 170341

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY HAMPTON, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-17-0341 |
| Filed<br>Modified upon<br>denial of rehearing | September 8, 2021<br><br>November 3, 2021 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 15-CF-1499; the Hon. Zina R. Cruse, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Ellen J. Curry, and Jennifer M. Lassy, of State Appellate Defender's Office, of Mt. Vernon, for appellant.<br><br>James A. Gomric, State's Attorney, of Belleville (Patrick Delfino, Patrick D. Daly, and Jessica L. Book, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE WHARTON delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment and opinion.


**OPINION**

¶ 1     The defendant, Tony Hampton, appeals his conviction for first degree murder, arguing that (1) he received ineffective assistance of counsel during his trial, (2) the court abused its discretion in refusing his tendered jury instruction on second degree murder, (3) the court erred in denying his motion for a new trial based on newly discovered evidence concerning his mental illness and intellectual disability, (4) his attorneys acted under an actual conflict of interest when they failed to argue their own ineffectiveness during proceedings on his posttrial motion, (5) his 75-year prison sentence is a *de facto* life sentence, which violates the Illinois proportionate penalties clause due to the defendant's mental illness and intellectual disability, and (6) the court abused its discretion in imposing an excessive sentence. On September 8, 2021, we issued an opinion affirming the defendant's conviction and sentence. On September 29, 2021, the defendant filed a petition for rehearing. After consideration of the arguments he raised, we now deny the petition for rehearing and issue this modified opinion. We again affirm the defendant's conviction and sentence.

¶ 2                                I. BACKGROUND

¶ 3     In the early morning hours of December 12, 2015, Salahudin Malik Robbins was shot to death in the parking lot of the Bottoms Up strip club in Brooklyn, Illinois. The shooting was captured on video by the club's security cameras. There is no dispute that two men shot at Robbins multiple times—the defendant and his cousin, Tiye Allen. A third man, Ryan Bryant, was with the defendant and Allen. The three men left the scene in a black Audi driven by Allen. They led police on a high-speed chase. They managed to evade police and later burned the black Audi in an effort to destroy evidence. At the defendant's trial, he attempted to demonstrate that his actions were justified as self-defense or the defense of others. His theory was based on an alleged "beef" between Bryant and Robbins. The defendant was 25 years old when the events at issue occurred. However, evidence presented at his sentencing hearing indicated that, due to an intellectual disability, he had the cognitive ability of an 11-year-old.

¶ 4     Brooklyn police officer Sherrod Stancil testified that, when he responded to the shooting, he saw a black Audi driving away from the area of Bottoms Up at a high rate of speed. He attempted to pull the vehicle over, but the vehicle managed to evade him during a high-speed chase.

¶ 5     Illinois State Police special agent Denis Janis testified at length about his investigation of the shooting. Much of his testimony focused on the footage obtained from the club's surveillance cameras. Janis first explained how the surveillance camera system worked. He explained that there were multiple external cameras, each of which captured a different area of the parking lot and the alley that connected Bottoms Up to another club called the Pink Slip. He further explained that the cameras did not record all the time. Instead, they operated through motion sensors, which caused each camera to begin recording when its sensor detected motion within the range of that camera. Janis noted that police also looked at footage from surveillance cameras inside the club;

however, the only pertinent information they obtained from these cameras was the time that the shooters entered and left the club. He testified that this was consistent with what he was told by the bar manager and other witnesses he interviewed, all of whom told him that no altercation took place inside the club before the shooting.

¶ 6 Janis testified that he was able to determine from the video footage that both shooters had "distinctive neck tattoos," which are visible in the footage. He was also able to determine that they arrived at the club in a black Audi at approximately 1:35 a.m. Janis testified that he was aware of the high-speed chase involving Officer Stancil and a black Audi.

¶ 7 A series of short video clips from the surveillance camera footage was then played for the jury. The first two clips were recorded by a surveillance camera located just inside the entrance to the club. These clips show patrons walking through a metal detector to gain entry to the club. Janis testified that these clips showed the victim, Malik Robbins, entering the club. At this point, the trial judge asked counsel to approach the bench to discuss the limits on the testimony Janis could give regarding video recordings of events he did not personally witness. The State argued that the witness could narrate what he sees as the video is played but that he could not identify individuals depicted in the video unless he is familiar with those individuals. The court directed prosecutors to establish how Janis knew the identities of any individuals he identified in his testimony. The court then allowed the State to continue playing the video clips.

¶ 8 Janis indicated that the next three clips showed a black Audi pulling into the parking lot and three individuals exiting the vehicle and entering the club. Janis was able to identify the driver of the vehicle as Tiye Allen. He was able to identify the two passengers as the defendant and Ryan Bryant. Asked to explain how he was able to identify these individuals, Janis explained that, although he did not know who the individuals were when he first saw the recordings, he later received photographs of the three suspects and compared them to the video images. He testified that "they appear to be the same people." He further testified that he later interviewed two of the suspects, the defendant and Allen.

¶ 9 As the next video clip was played for the jury, Janis testified that it showed the individuals he believed to be Bryant and the defendant leaving the club. He explained that, based on the time stamp on the video, they left the club approximately 40 minutes after they entered. Janis testified that the next clip showed Bryant going back into the club and then exiting with Allen. Both clips were recorded by a camera showing the entrance to the club. Janis also narrated the next two clips, which were recorded by a camera showing the portion of the parking lot where the black Audi was parked. In the clips, the defendant and Bryant can be seen getting into the Audi. Bryant can then be seen getting out of the Audi and running back toward the club. Finally, Bryant and Allen can be seen walking from the direction of the club to the Audi and getting into the Audi.

¶ 10 The next clip shown to the jury shows the Audi parked next to a white Dodge Charger. Janis testified that the clip was edited to play in fast motion. He explained that the original footage showed the three suspects sitting in the Audi for a period of 20 minutes. He testified that he did not see the defendant exit the vehicle at any point when viewing the original footage. He later learned, based on information from Bryant, that at some point, Bryant exited the Audi, got into the white Charger, and then returned to the Audi.

3

¶ 11    Janis narrated the next two clips, both of which showed an individual Janis believed to be Malik Robbins leaving the club with three individuals. Janis testified that he did not know the identities of the individuals leaving the club with Robbins.

¶ 12    The next two clips were played for the jury without narration from Janis, pursuant to the court's direction. The first of the two clips shows a walkway next to the side of the club. Robbins can be seen walking along that pathway with three women. Other individuals can be seen walking along the walkway behind them. Almost immediately after Robbins and his companions round the corner of the building, a few individuals can be seen running in the opposite direction. The second of the two clips shows the parking lot. Robbins can be seen dropping to the ground, rolling a few times, and coming to rest face down on the pavement next to the building. Then the defendant can be seen running toward Robbins, firing three shots at him at close range, and running away. When Robbins first comes to rest next to the building, one of his legs is bent at the knee so that his foot is pointed upwards. After the defendant fires the shots, Robbins's leg drops to the ground.

¶ 13    After the clips were played, the following exchange occurred between Janis and one of the prosecutors:

"Q. In examining the video of the alleyway, did you see anyone on video remove a gun from the deceased victim?

A. I did not see anyone remove a gun.

Q. Did you see anyone remove any items from the victim?"

Neither of the defendant's attorneys objected to these questions. However, when Janis began to answer the second question, the court interrupted to ask which clip the prosecutor was referencing in these questions. When the prosecutor indicated that he was not asking about a specific clip, the court asked how Janis could answer a question about what he saw on the video recordings without providing an answer that was inadmissible hearsay. At this point, one of the defense attorneys stated, "You're not saying anything else about the video, because even though you said that you weren't going to ask any more questions about the video, you asked a few more questions about the video." The prosecutor agreed to move on, and the court indicated that anything Janis was "about to say about something taken" from the victim would be stricken.

¶ 14    Another clip was then played for the jury. In this clip, Robbins can be seen lying on the ground, next to the building. Individuals can be seen walking past him. Some continue on their way, while others gather around the body. At one point, a man can be seen reaching down and picking something up. It is not clear whether the object was in Robbins's pocket or lying next to Robbins on the ground. Although it is not clear what the object is, it is rectangular in shape. The man who picked it up can then be seen walking away from Robbins. After the clip was played, the prosecutor asked Janis whether he saw anyone take anything from the victim's body. In response, Janis testified that a man appeared to remove an object from the victim's pocket and walk away. In response to further questioning, Janis testified that the object did not appear to be a gun. The defense did not object to these questions.

¶ 15    The prosecutor next asked Janis, "[W]ere you able to determine through any investigative methods where that particular person went who took the money?" At this point, defense counsel objected. The prosecutor rephrased the question, asking Janis if he determined where the individual who appeared to take something from the victim went. Janis stated that the individual

4

went down the alley toward the Pink Slip. He further testified that when he searched the victim's vehicle, he found no weapons or anything else of evidentiary value.

¶ 16    Janis testified that the license plate from the black Audi involved in the high-speed chase with Brooklyn police was traced to a gray Audi owned by a man in south St. Louis. Police learned that, although the license plate on the back of the gray Audi matched the plate that was on the black Audi driven by the suspects on the night of the shooting, the license plate on the front of the Audi was different. Ultimately, the plate from the front of the gray Audi was traced to another vehicle. When police located that vehicle, they learned that it was missing a license plate. There was no indication that the owner of the gray Audi or the owner of the third vehicle had any involvement in or knowledge of the shooting. Janis further testified that, a few days after the shooting, police in St. Louis recovered a black Audi that had been burned. That black Audi had the same license plate as the black Audi chased by Brooklyn police.

¶ 17    On cross-examination, Janis acknowledged that he was not able to find out whether Malik Robbins knew any of the three suspects, although he testified that he attempted to learn this information. He acknowledged that he was not able to interview Ryan Bryant because Bryant refused to speak with him. Janis also acknowledged that he did not interview any bystanders who were outside the club when Robbins's body was found. He explained that the bystanders had been cleared from the scene by the time he arrived.

¶ 18    Janis testified that there were no altercations inside the club that night, and he was not aware of any altercations that took place outside the club prior to the shooting. Janis acknowledged that there were "blind spots" in the surveillance camera footage system. He admitted that, when he first reviewed the surveillance camera footage, he believed that there were four people in the Audi but stated that he later learned there were only three. He explained that in the video he could see the car door open and close, but he could not see anyone walk between the black Audi and the white Charger.

¶ 19    The following exchange then took place between Janis and one of the defense attorneys:

"Q. Okay. And on that surveillance, *** there was someone, and according to you, you never talked to that person, bent down, and picked something up, correct?

A. Correct.

Q. You never found out what that item was, correct?

A. That's correct."

Counsel then asked Janis whether it would have been important to know what was removed from the victim's pocket. Janis acknowledged that this information would have been important. Asked if he ever found out what the object was, Janis replied, "Not from that person, no." Finally, Janis admitted that investigators never located the white Charger or found out who was in it, and he admitted that they never found out why the shooting occurred. He testified that he "seriously doubt[ed]" the full story would ever be known.

¶ 20    On redirect examination, Janis again testified without objection that he did not see anyone remove a gun from the victim's body when he watched the video recordings. Asked if he had obtained any information from any source about what was taken from Robbins's pocket, Janis began to testify to what he was told by a parking lot attendant. At this point, defense counsel objected on the grounds that the answer was hearsay. The prosecutor rephrased the question, and Janis testified that he found out that the object was cash. On recross, however, Janis

5

acknowledged that he did not know whether this information was accurate. He testified that he could not confirm it from watching the video.

¶ 21    The State also presented forensic evidence. Crime scene investigators found multiple shell casings lying on the ground at the crime scene. They recovered 12 shell casings from a .40-caliber weapon and 7 shell casings from a 9-millimeter weapon. Forensic scientist Thomas Gamboe, who specializes in firearm identification, examined the casings found at the scene. Based on the markings he found on the casings, he concluded that the .40-caliber casings were all fired from the same .40-caliber weapon and that the 9-millimeter casings were likewise all fired from the same 9-millimeter weapon. He testified that the fact that 12 .40-caliber casings were found indicates that the shooter either reloaded the weapon or used a high-capacity magazine. Gamboe also examined 11 bullets and bullet fragments that were recovered during the autopsy. Some were removed from Robbins's body, while others were recovered from his clothing. Gamboe determined that three of these were fired from the same 9-millimeter weapon, four others could have been fired from a 9- millimeter weapon, and one additional fragment was fired from a .40-caliber weapon.

¶ 22    Dr. Gershon Norfleet performed an autopsy on Malik Robbins. He found a total of 12 bullet wounds on Robbins's body, including both entrance wounds and exit wounds. He found two entrance wounds to the back of Robbins's head and one entrance wound to the side of the head. He found additional entrance wounds to the right lateral side of the chest, the left buttock, the lateral surface of the left thigh, the posterior surface of the right thigh, and the bottom of the right foot. Dr. Norfleet determined that the cause of death was gunshot wounds to the head and chest. He opined that the gunshot wounds to Robbins's head alone would have been sufficient to cause his death.

¶ 23    Ryan Bryant testified for the State. At the time of the defendant's trial, Bryant had not been charged in the murder of Robbins. He admitted that he was testifying pursuant to a grant of immunity. He explained that, although he could still be charged in Robbins's murder, his testimony in the defendant's trial could not be used against him. Bryant further acknowledged that he had prior convictions for assault and attempted robbery.

¶ 24    Bryant testified that on the night of the murder he went to Bottoms Up for drinks with the defendant and Allen. He testified that they arrived at approximately 1 or 2 in the morning and stayed at the club for 45 minutes to an hour. Bryant did not recall how many drinks he had that night, but he admitted that he was "a little bit" intoxicated. While they were there, they saw Malik Robbins in the club "with some girls." Bryant testified that he did not talk to Robbins at the club that night and did not see the defendant or Allen talking with him, either.

¶ 25    When asked about his relationships with the defendant, Allen, and Robbins, Bryant stated that he had known the defendant and Allen for approximately two years and that he spent time with them socially "a couple of times a month." He knew Robbins because Robbins got his hair cut at Bryant's father's barber shop. Bryant denied that he was having any problems or issues with Robbins at the time.

¶ 26    Bryant testified that at some point he and the defendant left the club. They thought that Allen was with them but soon realized that he was still inside the club. Bryant went back to get him. Once all three were in Allen's vehicle, they did not leave right away. Bryant explained that they stayed because the defendant "got to talking" to two people seated in a white Dodge Charger

6

parked next to Allen's vehicle. According to Bryant, the defendant was trying to convince the people in the Charger to give Bryant a ride home. Bryant initially testified that he recognized the people in the Charger but did not know them well. However, he later testified that when he got into the Charger, he realized that he did not know who the passenger was. He explained that, for this reason, he decided not to ride home with them. He then got back into the Audi.

¶ 27  Bryant testified that when he got back into the Audi he saw that the defendant and Allen both had semiautomatic weapons. One of the guns was next to Allen's leg, and the other was on the defendant's lap. Allen's gun had a long barrel, and the defendant's gun had a shorter barrel. Bryant testified that he did not see either of the guns before this time. According to Bryant, his companions said nothing to him about the guns, and he did not ask about them. Instead, he leaned his head back against the seat and "nodded off."

¶ 28  Bryant testified that he awoke and overheard part of a conversation between the defendant and Allen. He heard one of them say, "Why was he staring?" Bryant assumed that the question referred to Robbins because there were not many people in the club.

¶ 29  Bryant next testified that he heard Allen say, "There he go." He then heard gunshots coming from the driver's side of the car. When he looked up, he saw that Allen was standing outside the vehicle firing multiple shots toward the corner of the building, where Robbins was standing. According to Bryant, the defendant then got out of the Audi and ran around a truck that was parked next to them on the opposite side from the Dodge Charger. The defendant then began to fire in Robbins's direction also. Bryant testified that, after Robbins fell to the ground, the defendant went toward him and shot him a few more times at close range. Bryant did not know how many additional shots the defendant fired.

¶ 30  Bryant testified that after the shooting Allen drove them back to St. Louis, evading a police car that activated its lights to pull them over. He testified that they subsequently met up with the occupants of the white Dodge Charger in a vacant lot. They all "wiped" the black Audi clean at Allen's direction. Then the defendant poured gasoline on the Audi, and one of the men from the Charger lit it on fire. After they burned the car, Allen drove Bryant home in a different vehicle. According to Bryant, Allen told him to keep his mouth shut, and the defendant said, "I got him."

¶ 31  On cross-examination, Bryant was asked if there was any gunfire coming toward them during the shooting. He replied, "I don't believe so." When asked if this meant that there was no gunfire or he did not know, Bryant replied, "It didn't hit the car, so I couldn't tell you if it did."

¶ 32  Defense counsel questioned Bryant about an individual named Ryan Graham. Bryant indicated that he knew Graham. When asked how he knew Graham, Bryant responded, "That was the guy that was—I guess with the charges I received." Asked if Graham and Robbins were close friends, Bryant stated that he did not know. Bryant denied that Robbins ever confronted him at his father's barber shop over the robbery of Graham.

¶ 33  On redirect examination, Bryant testified that he did not see Robbins carrying a gun on the night of the shooting. He further testified that at no point that night was he afraid of Robbins.

¶ 34  The State played video recordings of two interviews the defendant gave to police. Both interviews took place on the same day, one week after the shooting. In the first interview, the defendant denied multiple times that he was in Brooklyn, Illinois, at any point during the night of the shooting. He insisted that he had not been to Brooklyn since 2011. The second interview took place a few hours later. Police showed the defendant surveillance camera footage of himself,

7

Allen, and Bryant going through the metal detector to enter the club. The defendant acknowledged that he was in the video. However, he denied knowing the two men seen entering with him. Asked if the man seen walking through the metal detector after him was Tiye, the defendant said, "No." Asked if he knew a man named Tiye, the defendant replied, "I know a Tiye. That's not Tiye." Asked if he knew Tiye Allen, the defendant stated that he knew a man named Tiye but did not know Tiye Allen.

¶ 35   The defendant's former girlfriend, Camille Foster, testified on his behalf. She testified that she knew Allen and Bryant through the defendant. Allen was the defendant's cousin, and Bryant was a friend of the defendant's family. Foster knew Robbins because he was a "close associate" of one of her other former boyfriends. She testified that she occasionally saw Robbins getting his hair cut at Bryant's father's barber shop.

¶ 36   Foster testified that, to her knowledge, the defendant did not have any issues with Robbins. Defense counsel began asking her about any "issues or beefs" Bryant had with Robbins. She testified that the two men had issues with each other. Asked to explain, Foster testified, "Well Ryan [Bryant] had robbed one of Malik's friends." The State objected. The State argued that the testimony was not relevant under *People v. Lynch*, 104 Ill. 2d 194 (1984), because Bryant was a witness, not a victim. The State also argued that there was no foundation establishing how Foster knew this information. In response, defense counsel argued that Foster knew the victim of Bryant's robbery and that she could testify to witnessing an argument between Bryant and Robbins in the barber shop. The court allowed the defense to continue to lay a foundation for Foster's testimony.

¶ 37   Asked if she knew Ryan Graham, Foster replied, "I don't know him, but I know who he is." She was next asked about her observations of Bryant and Robbins at the barber shop. She testified that she had seen them talking to each other there on multiple occasions and that she had seen Bryant cutting Robbins's hair "more than a few times." She noted that, on some occasions, they appeared to get along, while on other occasions, their demeanor toward each other was "aggressive." Foster described one incident in which Bryant and Robbins appeared to be arguing and using aggressive hand gestures toward each other. She explained that they were "standing close to each other, like face to face," and that they were yelling so loudly she could hear them from outside the barber shop. However, she was not able to hear what they were saying.

¶ 38   Finally, defense counsel asked Foster how she would describe Robbins's reputation in the neighborhood. She replied, "A bully. People are scared of him, but not—." At this point, the State interrupted her answer and made an objection. The court asked defense counsel how the testimony about Robbins's reputation was relevant. Counsel withdrew the question.

¶ 39   On cross-examination, Foster testified that the argument she witnessed between Bryant and Robbins took place late in the summer of 2015. She further testified that that was the last time she saw Bryant and Robbins together. She acknowledged that she did not tell police she witnessed any arguments between Bryant and Robbins when she was interviewed during the investigation of this case.

¶ 40   The defendant testified in his own defense. He testified that Allen was his cousin and Bryant was a friend of his brother and that they all grew up in the same neighborhood. The defendant knew Robbins because Robbins lived in this same neighborhood and because the defendant often saw Robbins at LeRoy's Barber Shop, which is owned by Bryant's father. The defendant testified

8

that he was not friends with Robbins, but he did not have any conflict with him either. When asked whether he was aware of any conflict between Robbins and Bryant, the defendant replied, "Not at the moment. I heard in—in the streets, like, as far as, like—." The State objected at this point, and the court sustained the objection.

¶ 41    The defendant went on to testify that he once observed Bryant and Robbins having an argument at the barber shop. They were speaking in loud voices and had balled their hands into fists, but no physical fight broke out. The defendant was then asked about Ryan Graham. He stated that he knew who Graham was but did not know him well. He testified that Graham and Robbins were good friends. Asked about Graham's relationship to Bryant, the defendant stated that they knew each other; however, he had never seen them interact with each other.

¶ 42    The defendant testified that, on the night of the shooting, he ran into Allen and Bryant while he was visiting his aunt. The three men decided to go out for drinks. Allen drove them from St. Louis to the Bottoms Up club in Illinois. According to the defendant, all three were already under the influence of alcohol and Ecstasy before they went to Illinois. When they got to the club, they drank some more. At one point, the defendant went to use the restroom. On his way back to where Allen and Bryant were standing, he noticed that Robbins was at the club. Robbins looked in their direction and stared at them "a couple of times." The defendant described Robbins's expression as a "bothered stare" or a "hard stare."

¶ 43    The defendant further testified that, after some time, Bryant announced that he was ready to leave. The defendant left the club with Bryant, but Allen apparently did not hear Bryant because he stayed behind. While Bryant and the defendant were walking toward the car, they had a conversation. When counsel attempted to ask the defendant what Bryant said during this conversation, the State objected. Initially, the court sustained the objection. However, defense counsel argued that he could use the statement to impeach Bryant's testimony that no conversation occurred while they were walking to the car. The court allowed him to attempt to lay the foundation for this testimony. The defendant testified that he asked Bryant what the "stare-down" in the club was about. He testified that Bryant answered his question and that, after hearing Bryant's response, the defendant did not believe that the "stare-down" had anything to do with him.

¶ 44    The defendant testified that he and Bryant realized that Allen was not with them when they got back to the car. Bryant went back into the club to get Allen. After Bryant returned with Allen, the three men sat in the car listening to music. About 15 to 20 minutes later, a white Dodge Charger pulled into the parking space next to theirs. According to the defendant, he and his companions all knew the occupants of the Dodge Charger, so they began chatting with them. At some point, Bryant got out of the black Audi and got into the white Dodge Charger. He sat there for approximately two or three minutes and then returned to the Audi. The defendant testified that at this point Bryant handed him a weapon. The defendant had not seen the weapon prior to this time.

¶ 45    Defense counsel once again inquired about the conversation with Bryant regarding Robbins's stare. However, the State objected, and the court sustained the objection. Defense counsel withdrew the question.

¶ 46    The defendant next testified that, soon after Bryant returned to the black Audi from the white Dodge Charger, the defendant heard Bryant say, "There he go." He stated that Allen got out of

9

the car and "got to shooting." The defendant did not know who fired the first shot he heard. He testified that, after Allen got out of the car, he heard someone say, "Get up." He testified that he got out of the car, ran behind a truck parked next to the Audi to shield himself, and started shooting. He claimed that he started shooting to protect himself, Allen, and Bryant.

¶ 47 The defendant then described what happened after the shooting. He stated that he, Bryant, and Allen got back into the car and that Allen drove back to Missouri. There, they left the Audi somewhere, drove in a Volkswagen to buy gasoline, and drove back to where the Audi was parked. According to the defendant, Bryant directed him and Allen to "wipe[ ] the Audi down" and told them how to do so in order to be sure they left no fingerprints. The defendant testified that, after they wiped down the Audi, Bryant poured gasoline on it and then drove away with the defendant and Allen.

¶ 48 The defendant admitted that he lied when he gave his statements to police. When asked why, the defendant explained that he lied to protect himself, Bryant, and Allen. Counsel also asked the defendant about his criminal record. The defendant acknowledged that he had unrelated charges pending for burglary and "tampering" and a previous record for "tampering." Asked to explain "tampering," the defendant replied, "Break into motor vehicles. Like, anything to do with cars."

¶ 49 Finally, the defendant testified that he looked up to Bryant because Bryant was the guy who "looked out for" the younger guys in the neighborhood. The defendant testified that he was not afraid of either Bryant or Robbins on the night of the murder.

¶ 50 On cross-examination, the defendant testified that there was no altercation inside the club that night, although Robbins stared "a couple [of] times over in the direction" of the defendant, Bryant, and Allen. The defendant testified that he did not know if there was an "issue" between Robbins and Bryant. The defendant acknowledged that he did not see any guns that night other than the ones he and Allen used. He admitted that he did not witness any aggression from Robbins that night other than "the stare-down from the club," and he admitted that he never saw Robbins with a gun. The prosecutor showed the defendant two still photographs taken from the surveillance footage. The defendant admitted that the first photograph showed him firing a gun "[i]n the direction of Malik Robbins." He admitted that the second photograph showed him shooting a man in the back of the head as the man lay on the ground. The defendant acknowledged that Bryant did not direct him to shoot Robbins.

¶ 51 On redirect examination, the following exchange took place between the defendant and one of his attorneys:

"Q. Okay. And do you know why [Bryant] handed you that gun?

A. While we was sitting in the car, I had a conversation with Ryan before we went in and got my cousin, Tiye Allen.

Q. Okay.

A. And I asked him what—why—what was the stare-down about.

Q. And he told you what—what it was about?

A. Yes.

Q. Did it concern you?

A. No.

Q. Did it concern him?

A. Yes."

¶ 52 The defendant was then asked to recount some of the details of the events that took place in the parking lot before and during the shooting. He testified that he heard a gunshot just before Allen got out of the car and started shooting. Asked if he believed that he saw or heard anyone shooting in the direction of the black Audi at any time before he started shooting, the defendant said, "No." However, he then testified that although there were "more shots fired," he did not know where they were coming from. Asked if he saw any threat, he stated that he did not. However, he subsequently testified that, when he began shooting, he was afraid for his life because he heard shots coming from the direction of the club.

¶ 53 The defense requested jury instructions on both self-defense and second degree murder based on a subjective but unreasonable belief in the need to act in self-defense. In support of the tendered instructions, counsel argued that the defendant had reason to believe someone was firing shots at the vehicle when he heard gunshots and saw his cousin shooting back. The court refused the instruction.

¶ 54 After the jury retired to begin its deliberations, one of the defendant's attorneys informed the court that the defense would be requesting a psychological evaluation of the defendant prior to sentencing. He explained, "it's just come to our attention that [the defendant] may have some serious mental issues." Counsel stated that he did not believe there was any question of the defendant's fitness to stand trial and he did not believe the defendant's mental illness would satisfy the requirements of the insanity defense. He explained, however, that a psychological evaluation was necessary for evidence in mitigation at sentencing. The State did not object, and the court ordered an evaluation by Dr. Daniel Cuneo.

¶ 55 The jury returned a verdict of guilty. The court ordered a presentence investigation report (PSI).

¶ 56 The PSI included a medical history for the defendant. In it, the probation officer who prepared the PSI noted that the defendant told her he had been diagnosed with schizophrenia and depression as a juvenile. Although the defendant indicated that he had been prescribed medication for these conditions in the past, he had not been under a doctor's care for several years. The PSI also included the defendant's criminal history. The history indicated that the defendant had 11 prior felony convictions, 3 prior misdemeanor convictions, and 2 pending felony charges. It also revealed that the defendant was once subject to the revocation of probation. He had no history of juvenile delinquency.

¶ 57 Dr. Cuneo indicated in his report that the defendant had an IQ of 65, which meant that his cognitive abilities were comparable to those of an 11-year-old. He diagnosed the defendant as suffering from post-traumatic stress disorder (PTSD), a mild intellectual disability, moderate cannabis use disorder, and moderate hallucinogen use disorder. Dr. Cuneo explained that the defendant's PTSD and substance abuse likely resulted from his traumatic childhood experiences. He stated that the defendant told him that he was born in prison to a drug-addicted mother and was then cared for by a succession of family members, including a cousin who physically abused him. At the age of 10, the defendant was removed from his family and sent to live in a group home, where he resided until he ran away at the age of 17. Dr. Cuneo further stated that the only time the defendant received treatment for his mental illness was while he lived in the group home. Dr. Cuneo opined that the defendant's mental illness and substance abuse likely contributed to

his actions on the night of the murder. However, he did not elaborate on the reasons for this opinion.

¶ 58   The defendant filed a motion for a new trial, arguing that Dr. Cuneo's opinion concerning the defendant's mental health and developmental disability constituted newly discovered evidence that warranted a new trial. On August 7, 2017, the court held a hearing on that motion, followed by a sentencing hearing.

¶ 59   Dr. Cuneo testified at the hearing. Much of his testimony mirrored the information in his report. However, he expanded on a few points. For example, he testified that he gave the defendant a reading test, which revealed that the defendant read at a fourth-grade level. Dr. Cuneo explained that it is common for people with intellectual disabilities to "mask" their disabilities to avoid being called "stupid." For this reason, Dr. Cuneo believed that the signs of the defendant's intellectual disability may not have been obvious to a layperson.

¶ 60   Dr. Cuneo further testified that the defendant's PTSD manifested itself in nightmares in which someone is shooting at him, detachment and estrangement from others, angry outbursts with little or no provocation, hypervigilance, and suspiciousness. He noted that, although the defendant did not experience delusions, his thinking had a "paranoid flavor." Asked if he believed the defendant's mental deficiencies contributed to his conduct on the night of the murder, Dr. Cuneo testified, "I would believe that they may very well have."

¶ 61   In support of the motion for a new trial, defense counsel argued that, had the defendant's attorneys been aware of the information in Dr. Cuneo's report prior to trial, they would have made different strategic choices at trial. Specifically, she stated that they would have (1) raised an additional affirmative defense, (2) urged the defendant not to testify, and (3) presented an expert witness to explain the defendant's mental defects to the jury. Counsel provided little explanation of how these decisions would have altered the outcome, although she noted that, when the defendant admitted during his testimony that he was not afraid of Robbins, "he did not fully understand" the question he was asked.

¶ 62   The State argued that even before trial the defendant's attorneys were aware that the defendant had mental health issues, at least to the extent that they knew they would need an expert witness to provide mitigating evidence for sentencing. The State also noted that medical records were provided to defense attorneys that were not available to prosecutors. The State further argued that newly discovered evidence only requires a new trial if it is conclusive evidence that would have changed the outcome of the trial. The State argued that this standard was not met in this case, explaining that the defendant would not qualify for the insanity defense. The court denied the motion for a new trial and moved on to sentencing.

¶ 63   Dr. Cuneo was called back to the stand. He testified that the defendant's mental illness can be treated, and he opined that the defendant could become a useful member of society if he receives treatment. Asked about how the defendant's mental health and intellectual disability impacted his conduct on the night of the murder, Dr. Cuneo explained that the combination of PTSD, an intellectual disability, and the use of drugs and alcohol on the night of the shooting all increased the likelihood that he would act out violently. Dr. Cuneo recommended that the defendant be placed in a prison facility with a special treatment unit for individuals with intellectual disabilities. On cross-examination, Dr. Cuneo acknowledged that the defendant

stopped taking psychotropic medication when he was 17 and that the defendant failed to complete a substance abuse treatment program in 2012.

The State argued that the defendant should be given a longer sentence than the 60-year sentence that had been imposed on his codefendant, Tiye Allen, because his conduct was more egregious than Allen's. The State acknowledged that harm to Malik Robbins was inherent in the offense but argued that the court could consider as a factor in aggravation the fact that the defendant's conduct also threatened harm to people other than Robbins. See 730 ILCS 5/5-5-3.2(a)(1) (West 2016). The prosecutor emphasized the fact that the defendant fired seven shots in a crowded parking lot and the fact that he and his companions led police on a high-speed chase. The State argued that three additional factors in aggravation were present: the defendant's lengthy criminal history (see *id.* § 5-5-3.2(a)(3)), the need to deter others (see *id.* § 5-5-3.2(a)(7)), and the defendant's lack of remorse (see *People v. Bannister*, 232 Ill. 2d 52, 92 (2008)).

Defense counsel emphasized the defendant's mental illnesses and intellectual disability. See 730 ILCS 5/5-5-3.1(a)(16) (West 2016). She noted that Allen received a sentence of 60 years, but unlike the defendant, there was no evidence that Allen had any mental health issues. She further emphasized Dr. Cuneo's testimony that the defendant could be restored to useful citizenship with proper treatment (see *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007)) and argued that the defendant failed to seek appropriate treatment because he lacked an understanding of his own condition.

The court found the following factors in aggravation: (1) the defendant's conduct threatened serious harm, (2) he had a lengthy criminal history, (3) the defendant showed a lack of remorse, and (4) there was a need to deter others. The court found the following factors in mitigation: (1) the defendant's mental defects and (2) the influence of drugs and alcohol. The court sentenced the defendant to a total of 75 years in prison, including the mandatory sentence enhancement of 25 years due to the use of a firearm (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)). This appeal followed. We will discuss additional factual matters as necessary to the disposition of the issues before us.

## II. ANALYSIS

### A. Ineffective Assistance of Counsel During Trial

The defendant first argues that he received ineffective assistance of counsel during his trial. He contends that his attorneys made three critical errors: (1) they elicited evidence related to other charges against the defendant when the court had already ruled that the State could not introduce such evidence, (2) they failed to object to testimony from Special Agent Denis Janis that undermined the defendant's claim of self-defense, and (3) they failed to use *Lynch* to argue for the admission of evidence concerning Robbins's reputation for violence and conversations between the defendant and Bryant about Robbins. We will consider each of these arguments in turn. First, however, we will review the standards applicable to these claims.

We review claims of ineffective assistance of counsel under the two-part test annunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under that test, a defendant must demonstrate that counsel's performance was deficient in that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. This requires the defendant

to overcome a strong presumption that counsel's decisions constituted sound trial strategy. *Id.* at 689. A defendant must also demonstrate that prejudice resulted from counsel's mistakes. *Id.* at 687. To do so, he must demonstrate that there is a reasonable probability that the result of the proceeding would have been different if not for counsel's deficient representation. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Our review is *de novo*. *People v. Makiel*, 358 Ill. App. 3d 102, 105 (2005).

¶ 71                                    1. *Evidence of the Defendant's Other Charges*

¶ 72        The defendant first argues that his trial attorneys provided ineffective assistance because they elicited testimony from the defendant about other offenses. He further argues that his attorneys exacerbated this error by addressing the topic with prospective jurors during *voir dire* and by eliciting details about his other crimes during the trial. We are not persuaded.

¶ 73        Ordinarily, evidence of a defendant's prior convictions is not admissible to show the defendant's propensity to commit crimes. Such evidence *is* admissible, however, if it is relevant for any purpose other than showing propensity. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). One purpose for which other-crimes evidence is normally admissible is to impeach the defendant's credibility as a witness if he testifies. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011). However, even when other-crimes evidence is relevant for a proper purpose, it should be excluded if the potential for unfair prejudice to the defendant outweighs the probative value of the evidence. *Id.*; *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).

¶ 74        Prior to trial in this case, the court found that the potential prejudice from other-crimes evidence outweighed its probative value. The court therefore ruled that evidence of the defendant's other charges would not be admissible to impeach his credibility as a witness unless he opened the door to such evidence. The trial judge noted that the defendant would open the door to the admission of other-crimes evidence if he testified that he had never been in trouble or if he testified about those other crimes.

¶ 75        During *voir dire*, defense counsel asked prospective jurors whether the knowledge that an individual had committed previous offenses would lead them to believe that he was likely to commit another offense. As we discussed earlier, defense counsel later elicited testimony from the defendant that he had pending charges of burglary and "tampering" and a prior conviction for "tampering." As we also discussed earlier, counsel then asked the defendant to explain what he meant by "tampering."

¶ 76        We agree with the defendant that counsel's decision to elicit testimony about his other charges did not constitute sound trial strategy. Because of the trial court's pretrial ruling, such evidence was to be excluded unless the defendant opened the door to it through his testimony. Counsel inquired about the defendant's other charges toward the end of direct examination. At that point, the defendant had not opened the door. However, we reject his claim of ineffective assistance of counsel because we do not believe that the defendant can demonstrate a reasonable likelihood that the result would have been different had counsel not elicited this testimony.

¶ 77        We reach this conclusion for two reasons. First, the topic was addressed only briefly, and the State did not cross-examine the defendant about his other charges or mention them during closing argument. These facts tend to mitigate the prejudicial effects of other-crimes evidence. See *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 31.

14

¶ 78    Second, the evidence of the defendant's guilt was overwhelming. Jurors watched the surveillance camera video and saw the defendant run toward Malik Robbins and fire three shots into his head at close range while Robbins lay face down on the ground. This undisputed evidence effectively refuted the defendant's claim of self-defense because the use of deadly force in self-defense is only justified if the defendant uses no more force than he reasonably believes is necessary to avert the danger. See *People v. Washington*, 2012 IL 110283, ¶ 35. In addition, while we recognize that the defendant also argues that his attorneys' ineffective assistance prevented him from presenting evidence that would have supported his claim that he believed Robbins posed a threat, there was no evidence that on the night of the shooting Robbins did anything more threatening than stare at the defendant, Allen, and Bryant in the club.

¶ 79    It is also worth noting that there was significant evidence to suggest that the murder was planned in advance. Allen drove with the defendant and Bryant to Illinois in a vehicle bearing a license plate stolen from another vehicle, a gray Audi. The stolen plate was replaced on the gray Audi with a plate stolen from a third vehicle. Allen, Bryant, and the defendant waited in their car for at least 20 minutes before Robbins left the club. After fleeing the scene, the three men went to great lengths to destroy evidence of their involvement in the crime. This evidence also undermines any claim that the defendant acted under a belief that there was an imminent threat of danger from Robbins.

¶ 80    In the face of the overwhelming evidence of the defendant's guilt, we do not believe that the brief reference to the defendant's other charges during trial, coupled with counsel's questions during *voir dire*, had any impact on the jury's verdict. As such, the defendant cannot demonstrate a reasonable probability of a different outcome, as is necessary to support his claim of ineffective assistance of counsel.

¶ 81                                    2. *Janis's Testimony*

¶ 82    The defendant takes issue with two aspects of Janis's testimony. First, he argues that Janis invaded the province of the jury when he testified multiple times that the man in the surveillance video seen removing an object from Robbins did not remove a gun. Second, the defendant argues that Janis's testimony identifying the object taken as cash was inadmissible hearsay. The defendant argues that his trial attorneys were ineffective because they did not object to this evidence. We reject his claim because we find that he is unable to establish prejudice.

¶ 83    We agree with the defendant that the testimony he challenges on appeal was inadmissible. Video recordings are admissible as substantive evidence that "speaks for itself" so long as a proper foundation is laid. (Internal quotation marks omitted.) *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 34. Testimony about the contents of a video recording by a witness with no firsthand knowledge of the events depicted is treated as the opinion testimony of a lay witness. See *id.* ¶¶ 35-37. Thus, the witness's opinion as to the contents of a video recording is inadmissible if the jury is as capable as the witness of drawing inferences or conclusions from the recording. *Id.* ¶ 36 (citing *Freeding- Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 221 (1985)).

¶ 84    Here, Janis did not have firsthand knowledge of the events depicted in the surveillance video. As such, there were limits to the testimony he could properly provide. A witness with no firsthand knowledge of the events depicted is permitted to identify the defendant and other individuals appearing in a video recording if (1) his identification is rationally based on his perceptions and

15

(2) his identification testimony would be helpful to the jury in its determination of a fact in issue. *People v. Thompson*, 2016 IL 118667, ¶ 50. A witness's testimony identifying the defendant is helpful to the jury if "there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Id.* This standard is satisfied where the witness has had enough contact with the defendant "to achieve a level of familiarity that renders the opinion helpful." *Id.* These same standards apply to testimony identifying an object in a video recording. *People v. Gharrett*, 2016 IL App (4th) 140315, ¶¶ 75- 76.

¶ 85    A witness can also testify concerning other aspects of the events depicted in the video if the witness is in a better position than the jury to reach conclusions or draw inferences from the recording. See *Freeding-Skokie Roll-Off Service*, 108 Ill. 2d at 221 (excluding testimony where the jury was able to draw inferences as well as the witness); *United States v. Begay*, 42 F.3d 486, 503 (9th Cir. 1994) (finding an officer's testimony narrating the events shown on a video-recording to be proper where the recording showed the actions of approximately 200 individuals and the officer—who spent over 100 hours watching the video before trial—was in a better position to notice details in the recording than were jurors, who viewed it only once).

¶ 86    Based on these principles, Janis's testimony opining that the object taken from Robbins's body did not look like a gun was not proper. There was no evidence that Janis was more likely to correctly identify the object than the jurors. Although the defense team did make at least one objection to testimony about what was occurring in the video, they did not continue to object or insist on a definitive ruling on the matter. In addition, although counsel objected when Janis began testifying to what the parking lot attendant told him, they did not renew the objection when the prosecutor rephrased the question and elicited the substance of that statement.[1]

¶ 87    We note that counsel responded to Janis's testimony during cross-examination by eliciting from him an admission that he did not know whether the information he received concerning the object taken from Robbins's body was accurate. We also note that a defendant is entitled to competent representation, not perfect representation. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. We need not determine whether counsel's performance met this standard, however, because we find that the defendant is unable to establish prejudice, as required under the *Strickland* test.

¶ 88    Because a defendant must satisfy both parts of the *Strickland* test, we may reject a claim of ineffective assistance of counsel based solely on a lack of prejudice if it is more expeditious to do so. *Strickland*, 466 U.S. at 697; *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998). Here, the State presented evidence that no weapons were found at the scene. The State also presented forensic evidence showing that all the shell casings recovered from the scene were fired from the

---

[1]Although the defendant does not challenge the admissibility of Janis's testimony identifying himon the surveillance footage, we also note that counsel failed to request an opportunity to question Janis outside the jury's presence regarding "the level of [Janis's] familiarity [with the defendant] as well as any bias or prejudice" (*Thompson*, 2016 IL 118667, ¶ 59). The Illinois Supreme Court has held that this procedure should be followed whenever a law enforcement officer provides testimony identifying a defendant from a video recording in order to "sufficiently safeguard a defendant's rights." *Id.* Janis's testimony identifying the defendant on the video clips should not have been admitted without following this procedure. However, the defendant does not raise this issue or challenge this aspect of Janis's testimony, and his identity was not a contested issue at trial.

same two weapons. However, the State's firearm identification expert was not able to make the same determination with respect to the bullet fragments recovered during the autopsy. In addition, there was also evidence that someone removed an item from Robbins's body before police secured the murder scene. Thus, the State attempted to prove that the item taken from Robbins's body was not a gun. The defendant argues that Janis's inadmissible testimony destroyed his claim of self-defense because the jurors could have determined that the object was a gun had Janis not told them it was not a gun. We are not convinced.

¶ 89    We recognize that whether the object taken from Robbins was a gun was a question of fact to be resolved by the jury. However, there was no evidence to support a finding that Robbins ever brandished or fired a gun that night. The surveillance camera footage indicates that Robbins was shot immediately after leaving the club. As we noted earlier, patrons had to go through a metal detector to enter the club. Jurors were aware of this fact because they saw video clips showing the defendant going through the metal detector as he entered the club with Bryant and Allen. As we have discussed, the forensic evidence indicated that all the shell casings recovered from the scene were fired from the same two weapons. The only bullets that could have come from a third gun were the fragments recovered from Robbins's body and clothing during the autopsy. Moreover, the defendant admitted that he did not see Robbins brandish a gun that night. Based on the totality of this evidence, we do not believe it is reasonably probable that the jury would have found that Robbins brandished a weapon if Janis's testimony had been excluded. As such, the defendant has not demonstrated the prejudice necessary to support his claim of ineffective assistance of counsel.

¶ 90                                    3. Lynch *Evidence*

¶ 91    The defendant next argues that his attorneys were ineffective because they failed to argue that certain evidence was admissible under *Lynch*, 104 Ill. 2d 194. He points to Camille Foster's testimony that Robbins had the reputation of being a bully and three attempts by defense counsel to elicit testimony from the defendant concerning statements Bryant made about Bryant's "beef" with Robbins. The defendant acknowledges that counsel sought to have the testimony admitted. He contends, however, that they failed to make the strongest possible argument in favor of admission of the testimony by failing to argue that it was admissible under *Lynch*. We disagree.

¶ 92    In *Lynch*, the Illinois Supreme Court held that, "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence." *Id.* at 200. The court explained that such evidence is relevant for two purposes. *Id.* at 199-200. First, "the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior." *Id.* at 200. Second, where witnesses give conflicting accounts of the events at issue, evidence of the victim's violent character might help support the defendant's version of events. *Id.* Evidence of a victim's violent character can include evidence of his reputation in the community, such as the testimony offered by Camille Foster in this case. See *People v. Dennis*, 373 Ill. App. 3d 30, 52-53 (2007). Evidence that a victim has made threats against the defendant is also relevant and admissible. *Lynch*, 104 Ill. 2d at 201.

¶ 93    Evidence of a victim's violent character is not admissible absent at least some evidence showing that the victim was the initial aggressor. *Id.* at 204. The State objected to the relevant testimony at trial on this basis. In a case such as this, where it is apparent throughout the trial that

self-defense is an issue, trial courts have the discretion to admit *Lynch* evidence before the defendant presents evidence that the victim is the initial aggressor. *Id.* at 204-05. It is worth noting that, here, only two witnesses testified about the events at issue—Bryant and the defendant. As such, it was clear throughout the trial that any evidence that Robbins was the initial aggressor would not be presented until the defendant took the stand. Significantly, however, no such evidence was ever presented. As we discussed earlier, there was no evidence that Robbins did anything more threatening than stare angrily at Bryant on the night of the murder. Thus, evidence of Robbins's violent character was properly excluded under *Lynch*.

¶ 94    Moreover, we are not convinced that the defendant can demonstrate a reasonable probability of a more favorable outcome had counsel successfully argued for the admission of the testimony at issue. We reach this conclusion because we find that the record is nearly devoid of evidence that would have allowed a rational jury to accept the defendant's claim that he acted in self-defense.

¶ 95    There are six elements to a claim of self-defense: (1) force was threatened against the defendant, (2) the defendant was not the initial aggressor, (3) the risk of harm was imminent, (4) the threatened force was not lawful, (5) the defendant subjectively believed that the use of force was necessary to avert the danger, and (6) the defendant's belief was objectively reasonable. *Washington*, 2012 IL 110283, ¶ 35. The defendant must believe that the type and amount of force used was necessary to avert the danger. *People v. Anderson*, 234 Ill. App. 3d 899, 906 (1992). To support a claim of self-defense, a defendant must present at least some evidence of each of these elements. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). Once he does so, the burden shifts to the State to negate at least one element of self-defense by proof beyond a reasonable doubt. *Id.* at 128. This is because lack of legal justification is an element of the crime of murder. *Id.* at 127.

¶ 96    In this case, the defendant presented some evidence to suggest that there was animosity between Bryant and Robbins, although that evidence was contradicted by Bryant's testimony. The defendant also testified at one point that he fired his weapon because he was afraid for his life, even though he earlier testified that he was never afraid of Robbins on the night in question. In support of his claim that he feared for his life, the defendant testified that he heard shots being fired from the direction of the club, although he never specifically claimed that shots were fired toward Allen's vehicle. However, there was no evidence that Robbins ever brandished a weapon, acted aggressively, or threatened the defendant and his companions that night. Instead, the evidence showed that they left the club without incident at least 20 minutes before Robbins left. There is no evidence that Robbins even approached Allen's vehicle before Allen and the defendant jumped out of the vehicle and began shooting at him. To support a claim of self-defense, the perceived threat of harm must be *imminent*. See *Washington*, 2012 IL 110283, ¶ 35. Moreover, the amount of force used must be no more than is necessary to avert the danger. See *Anderson*, 234 Ill. App. 3d at 906. Here, the defendant fired three bullets into the back of Robbins's head as he lay face down on the ground posing no threat. In the face of this evidence, the defendant's claim of self-defense would have failed even if counsel had successfully argued for the admission of Bryant's statements to the defendant and Foster's testimony concerning Robbins's reputation in the community. For these reasons, the defendant cannot demonstrate that prejudice resulted from the alleged flaws in his attorneys' performance, and his claim of ineffective assistance must therefore fail.

18

B. Jury Instructions

¶ 98 The defendant argues that the court erred in refusing to instruct the jury on second degree murder. We disagree.

¶ 99 Conduct that would otherwise constitute first degree murder instead constitutes second degree murder when either of the two statutory mitigating circumstances are present. See 720 ILCS 5/9-2(a) (West 2014). The mitigating circumstance at issue in this case is what is generally referred to as "imperfect self-defense." *Jeffries*, 164 Ill. 2d at 113. A conviction for second degree murder based on the mitigating factor of imperfect self-defense is appropriate when "there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *Id.*

¶ 100 A defendant is entitled to an instruction on second degree murder if there is some evidence in the record to support his claim that a mitigating circumstance is present. *People v. McDonald*, 2016 IL 118882, ¶ 25. The determination of whether to give the instruction is a matter within the discretion of the trial court, and "when the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction," we review its decision for an abuse of that discretion. *Id.* ¶ 42.

¶ 101 It is important to note that, while often couched in terms of an actual but unreasonable belief in the need to act in self-defense, the mitigating circumstance of "imperfect self-defense" requires evidence that the defendant believed circumstances to be present that would have justified the homicide based on self-defense. See 720 ILCS 5/9-2(a)(2) (West 2014). We have already discussed the circumstances that must be present for a homicide to be justified as self-defense. Although the defendant testified in general terms that he feared for his life when he shot Robbins, we do not believe the record in this case contains evidence that the defendant believed, even subjectively, that all of those circumstances were present. In particular, the record contains no evidence that the defendant believed the risk of harm was imminent (see *Washington*, 2012 IL 110283, ¶ 35) or that the amount of force used was necessary to avert any perceived danger (*Anderson*, 234 Ill. App. 3d at 906). As we have discussed, the evidence showed that the defendant left the club with Allen and Bryant at least 20 minutes before Robbins exited. The defendant and Bryant both testified that the three men were sitting in Allen's vehicle during this time. When Robbins emerged from the club, they easily could have driven away if they believed he posed a danger. Instead, they exited the vehicle and fired multiple bullets at Robbins. There is no indication that Robbins ever attempted to approach the vehicle. As we have also discussed, the defendant approached Robbins and fired three bullets into the back of his head as he lay on the ground. Under these circumstances, there was no evidence to support the defendant's claim that he believed the circumstances were present that would have justified the shooting as self-defense. The trial court did not abuse its discretion in refusing the instruction.

¶ 102 C. Ruling on the Defendant's Motion for a New Trial

¶ 103 The defendant next argues that the court erred in denying his motion for a new trial based on the newly discovered evidence of his intellectual disability and mental health. We disagree.

¶ 104 A trial court should grant a motion for a new trial on the basis of newly discovered evidence if that evidence is material and noncumulative and conclusive enough that it would " 'probably change the result on retrial.' " *People v. Molstad*, 101 Ill. 2d 128, 134 (1984) (quoting *People v.*

*Baker*, 16 Ill. 2d 364, 374 (1959)). We review the trial court's ruling on a motion for a new trial for an abuse of discretion. *Id.* at 136.

¶ 105    Evidence discovered after trial is "newly discovered evidence" for purposes of this test if the evidence could not have been discovered before trial through the exercise of due diligence. *Id.* at 134. Although the trial judge did not expressly set forth her rationale for denying the defendant's motion for a new trial, she made statements at the hearing implicitly indicating that she believed this standard was met. Before the attorneys presented their arguments on the motion, the judge stated, "I get the impression from counsel that these are issues that have arisen and that you have just really become aware of, meaning defense counsel." Significantly, she then framed the primary issue as whether the evidence "could have made a difference in the trial." Thus, it is clear that the trial court found the evidence in question to be "newly discovered evidence" that could not have been discovered earlier through the exercise of due diligence. It is worth noting that this conclusion is supported by Dr. Cuneo's testimony that people with intellectual disabilities and mental health defects like the defendant often successfully mask their disabilities.

¶ 106    The next question is whether the evidence is cumulative. Evidence is cumulative if it "adds nothing to what is already before the jury." *Id.* at 135. Here, no evidence concerning the defendant's intellectual disability or mental health was before the jury. Thus, we agree with the defendant that the evidence was not cumulative. We note that the court's statement framing the issue as whether the evidence was conclusive enough to change the result of the defendant's trial indicates that the court reached the same conclusion.

¶ 107    The third question is whether the evidence of the defendant's mental defects was conclusive enough that it would have been likely to produce a different result at trial. *Id.* We note that the defendant does not appear to argue that the evidence would have led to an acquittal; instead, he argues that the jury likely would have accepted his claim of imperfect self-defense and found him guilty of second degree murder rather than first degree murder. The defendant posits that evidence that he suffered from PTSD and had the intellectual capacity of an 11-year-old would have "shed new light on his actions and perceptions that night." We are not persuaded.

¶ 108    The flaw in the defendant's argument is that his own testimony negated any possible claim that the mitigating circumstance of "imperfect self-defense" was present. The defendant explicitly admitted that he was not afraid of Robbins at any time on the night of the murder, and he acknowledged that the most aggressive behavior he witnessed from Robbins that night was a "bothered stare" in the club. As noted earlier, however, the defendant did testify that he heard shots fired from the direction of the club. According to Dr. Cuneo, the defendant's combination of PTSD, substance abuse, and intellectual disability increased the likelihood that he would act out violently. The evidence here shows, however, that the defendant did more than spontaneously react to gunshots that he may or may not have heard coming from the direction of the club. Instead, the evidence shows that the defendant approached a man he admitted he never feared while that man was lying face down on the ground and fired three shots into his head at close range. Moreover, as we discussed earlier, significant evidence also suggests that the shooting was planned in advance. Dr. Cuneo specifically testified that the defendant's mental conditions would not have an impact on conduct that was planned in advance. For these reasons, we find no abuse of discretion in the court's decision to deny the defendant's motion for a new trial.

20

¶ 109                    D. Conflict of Interest During Proceedings on the Motion for a New Trial

¶ 110        The defendant next asserts that he was denied the effective assistance of counsel during proceedings on his motion for a new trial. He contends that his attorneys were acting under an actual conflict of interest when they failed to argue that they were ineffective for failing to exercise due diligence to discover evidence of his intellectual disability and mental health diagnoses before trial. We disagree.

¶ 111        A defendant's right to effective assistance of counsel includes a right to representation that is free from conflicts of interest. *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). A conflict of interest can be either *per se* or actual. *People v. Brown*, 2017 IL App (3d) 140921, ¶ 30. If a *per se* conflict exists, the defendant is not required to demonstrate that counsel's performance was adversely affected by the conflict. "In other words, a defendant is not required to show actual prejudice when a *per se* conflict exists." *Hernandez*, 231 Ill. 2d at 143. By contrast, to establish a violation of the right to counsel due to an actual conflict of interest, a defendant must demonstrate that the conflict "adversely affected his counsel's performance." *Id.* at 144. To do so, the defendant must point to a specific defect in counsel's performance that is attributable to the conflict. *People v. Morales*, 209 Ill. 2d 340, 349 (2004). "Speculative allegations and conclusory statements are not sufficient ***." *Id.* We review *de novo* the question of whether the defendant's attorneys were laboring under a conflict of interest. *People v. Garcia*, 2018 IL App (5th) 150363, ¶ 26.

¶ 112        In support of his claim that his attorneys were acting under an actual conflict of interest, the defendant calls our attention to this court's prior decision in *Garcia* and the Third District's decision in *Brown*. We find both cases to be distinguishable.

¶ 113        Both *Garcia* and *Brown* involved posttrial motions in which the defendants' attorneys argued that they provided ineffective assistance during trial. *Id.* ¶ 39; *Brown*, 2017 IL App (3d) 140921, ¶ 32. In both cases, the attorneys failed to make appropriate arguments and/or to take necessary steps, such as attaching affidavits, to support their claims of ineffective assistance. See *Garcia*, 2018 IL App (5th) 150363, ¶¶ 40-42; *Brown*, 2017 IL App (3d) 140921, ¶¶ 32-33. The appellate courts concluded that these failures were attributable to the attorneys' reluctance to argue their own ineffectiveness. *Garcia*, 2018 IL App (5th) 150363, ¶ 42; *Brown*, 2017 IL App (3d) 140921, ¶ 33. The *Brown* court explained that although attorneys are not obliged to raise issues they believe lack merit, including the issue of their own ineffectiveness, once an attorney chooses to include that issue in a posttrial motion, he or she is under an obligation to argue the issue "zealously and competently" in proceedings on the motion. *Brown*, 2017 IL App (3d) 140921, ¶ 34.

¶ 114        In this case, unlike *Garcia* and *Brown*, counsel did *not* argue that they were ineffective for failing to discover the full extent of the defendant's mental health issues prior to trial. The defendant argues, however, that under the facts of this case, they were obligated to do so. He points to the fact that a prosecutor told the court that defense counsel had access to medical records before trial that were not available to prosecutors. On appeal, the defendant argues that his attorneys "had two choices"; they could either "rebut the State's claim" or they could "concede [their] failure to exercise due diligence" and argue that this failure constituted ineffective assistance of counsel. We do not find this argument persuasive.

21

¶ 115    As we discussed earlier, the court appeared to accept the defendant's argument that the evidence was newly discovered evidence. Although one of the prosecutors did point out that defense counsel had access to more of the defendant's medical records than the prosecution, the State did not explicitly argue that counsel failed to exercise due diligence or that the evidence was not newly discovered. Moreover, defense counsel specifically stated that, although the defendant's attorneys were aware that he had mental health issues, they did not know that he had an intellectual disability or that he had the specific diagnoses involved until Dr. Cuneo examined the defendant. Under the facts of this case, we do not believe an argument of ineffective assistance of counsel was a necessary component of or corollary to the arguments counsel raised in support of the defendant's motion for a new trial. Thus, we do not find this case to be analogous to *Garcia* or *Brown*. For these reasons, we reject the defendant's claim that he was denied the assistance of conflict-free counsel.

¶ 116                                            E. Sentencing

¶ 117    The defendant's final contentions concern his 75-year sentence. He argues that the sentence violates the proportionate penalties clause of the Illinois Constitution. Alternatively, he argues that the sentence is excessive and constitutes an abuse of the trial court's discretion. We reject both claims.

¶ 118                          1. *Violation of the Proportionate Penalties Clause*

¶ 119    The defendant relies on the First District's decision in *People v. Coty*, 2018 IL App (1st) 162383 (*Coty I*), *rev'd*, 2020 IL 123972. There, the First District held that a 50-year sentence constituted a *de facto* life sentence and that imposing such a sentence on an intellectually disabled adult violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). While this matter was pending on appeal, the Illinois Supreme Court reversed that holding. *People v. Coty*, 2020 IL 123972, ¶ 1 (*Coty II*). The instant case differs from *Coty* in one key respect—the sole issue in *Coty* was whether the defendant's intellectual disability precluded the imposition of a *de facto* life sentence, while the instant case involves a defendant who also suffers from treatable mental illnesses. To understand the significance of this distinction, we must consider the precedents and rationale underlying the supreme court's decision in *Coty II*.

¶ 120    The questions involved in both *Coty* and this case arise from a series of United States Supreme Court cases addressing what limits the eighth amendment places on sentences that may be imposed on two classes of defendants with characteristics that make them less culpable than other defendants—juveniles and individuals with intellectual disabilities. We note that the defendant in this case invokes only the Illinois proportionate penalties clause and does not rely on the eighth amendment's prohibition on cruel and unusual punishment. The eighth amendment cases are relevant because the proportionate penalties clause provides at least as much protection as the eighth amendment. See *id.* ¶ 45 n.11 (explaining that it is unclear whether the protections offered by the two provisions are coextensive or whether the proportionate penalties clause affords greater protection than the eighth amendment).

¶ 121    We begin with *Atkins v. Virginia*, 536 U.S. 304 (2002). There, the United States Supreme Court held that the eighth amendment categorically precludes imposition of the death penalty on adult defendants with intellectual disabilities. *Id.* at 318. In reaching this conclusion, the Court

22

pointed to six characteristics of intellectually disabled individuals that reduce their moral culpability—specifically, a reduced capacity to (1) understand and process information, (2) communicate with others, (3) learn from mistakes or from experience, (4) engage in logical reasoning, (5) control impulses, and (6) understand the actions and reactions of other people. *Id.*

¶ 122    Next, in *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005), the Court held that the eighth amendment categorically prohibits death sentences for juvenile defendants. In *Graham v. Florida*, 560 U.S. 48, 82 (2010), the Court held that the eighth amendment likewise categorically precludes sentences of natural life in prison for juveniles who commit crimes other than homicide. The Court's decisions in *Roper* and *Graham* were premised on the characteristics of youth that make juvenile defendants both less morally culpable and more likely to be rehabilitated than adult defendants. *People v. Holman*, 2017 IL 120655, ¶ 35 (citing *Miller v. Alabama*, 567 U.S. 460, 471-73 (2012) (discussing *Roper* and *Graham*)).

¶ 123    The Court considered the characteristics it described in *Roper* and *Graham* when it decided *Miller*. There, the Court struck down a mandatory sentence of life in prison without the possibility of parole for a juvenile murder defendant, explaining that, by making the defendant's "youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a [sentencing] scheme poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at 479. The *Miller* Court did not decide whether the eighth amendment required a categorical bar on any sentence of life without parole for juvenile defendants. *Id.* However, the Court suggested that such a sentence would be constitutionally permissible for "the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at 479-80. Even though the Court did not rule on the constitutionality of discretionary life sentences for juvenile homicide defendants, it suggested that such a sentence would be permissible so long as the sentencing court considers the mitigating features of the defendant's "youth and attendant characteristics" before deciding to impose that sentence. *Id.* at 483. The Court subsequently held that a specific finding of permanent incorrigibility is not necessary before a juvenile murder defendant can be sentenced to natural life in prison. *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1318-19 (2021).

¶ 124    In *Holman*, the Illinois Supreme Court considered whether *Miller* is applicable to discretionary natural life sentences as well. *Holman*, 2017 IL 120655, ¶ 34. The court found that it is, emphasizing that "*Miller* contains language that is significantly broader than its core holding." *Id.* ¶ 38. We note that in *Jones*, the United States Supreme Court reached the same conclusion. *Jones*, 593 U.S. at ___, 141 S. Ct. at 1312. The *Holman* court went on to hold that, before a juvenile may be sentenced to natural life in prison, the sentencing court must consider the "defendant's youth and its attendant characteristics." *Holman*, 2017 IL 120655, ¶ 46. The court further held that this inquiry must include consideration of five mitigating features of youth identified by the *Miller* Court. See *id.* (citing *Miller*, 567 U.S. at 477-78).

¶ 125    The Illinois Supreme Court subsequently held that *Miller* and its progeny apply to a sentence for a term of years "that cannot be served in one lifetime," explaining that such a sentence is "the functional equivalent of life without the possibility of parole." *People v. Reyes*, 2016 IL 119271, ¶ 9 (*per curiam*). Such sentences have come to be called "*de facto*" life sentences, and Illinois courts treat them the same as actual life sentences for purposes of *Miller*. See *People v. Buffer*, 2019 IL 122327, ¶ 27.

¶ 126    In *Coty I*, the First District emphasized the mitigating characteristics of intellectually disabled adults identified by the United States Supreme Court in *Atkins*. *Coty I*, 2018 IL App (1st) 162383, ¶ 75 (citing *Atkins*, 536 U.S. at 318). The court held that, considering these characteristics, the proportionate penalties clause requires consideration of these factors before a natural life sentence may be imposed on an intellectually disabled adult. *Id.* ¶ 77. As the Illinois Supreme Court explained in *Coty II*, the First District thus "extended the [procedural] requirements of *Miller* and its progeny, via *Atkins*, to adult offenders with intellectual disabilities." *Coty II*, 2020 IL 123972, ¶ 17.

¶ 127    In overturning the First District's decision, the supreme court explained that, although the factors discussed by the *Atkins* Court reduce the culpability of an intellectually disabled adult defendant (see *id.* ¶ 33 (citing *Atkins*, 536 U.S. at 320)), the same factors also "impair rehabilitative potential, and, unlike a juvenile, whose mental development and maturation will eventually increase that potential, the same cannot generally be said of the intellectually disabled over time" (*id.* ¶ 37). The court explained that although the *Miller* decision was "based in part upon the lesser culpability of youth," a characteristic shared by intellectually disabled adults, the *Miller* Court's primary concern was "the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled." (Emphasis in original.) *Id.* ¶ 39. The Illinois Supreme Court ultimately held that a natural life sentence, actual or *de facto*, does not violate the proportionate penalties clause as applied to an intellectually disabled adult. *Id.* ¶ 44.

¶ 128    In this case, unlike *Coty*, the defendant's intellectual disability was not the only potentially mitigating factor. As we have discussed at length, the defendant has been diagnosed with mental illnesses—specifically, PTSD and substance abuse disorders. Mental illness, unlike youth, is not an inherently transient condition. While a young defendant will necessarily mature, a mentally ill defendant will not automatically recover from his illness. Unlike intellectual disability, however, mental illness is not an inherently static condition either. Some mental illnesses can be successfully treated. Here, Dr. Cuneo specifically testified that the defendant's illnesses can be treated and that, with appropriate treatment, the defendant can be rehabilitated. As such, we find *Coty* to be distinguishable from the case before us.

¶ 129    However, we do not believe this is the proper case in which to resolve the issue raised by the defendant—the viability of an as-applied challenge to an actual or *de facto* life sentence for a mentally ill defendant under the Illinois proportionate penalties clause. Under the specific facts of this case, we can find no constitutional violation.

¶ 130    We reach this conclusion for three reasons. First, we emphasize that, although Dr. Cuneo opined that the defendant could be rehabilitated if he received appropriate treatment for his mental illnesses, the record clearly demonstrates that the defendant has not sought appropriate treatment outside of an institutional setting. In the face of this evidence, we do not believe the court was required to find that the defendant had much, if any, rehabilitative potential.

¶ 131    Second, it is worth noting that Dr. Cuneo testified that the defendant's intellectual disability also played a role in his actions on the night of Malik Robbins's murder. As our supreme court explained in *Coty II*, this fact weighs against a finding of rehabilitative potential because intellectual disability is a permanent condition. *Id.* ¶¶ 34-35. Indeed, the court noted that, in cases where there is evidence that a defendant's intellectual disability increases his probability of future dangerousness, the court can consider the likelihood of future dangerousness as an aggravating factor. See *id.* ¶¶ 34-36.

24

¶ 132    Finally, the record in this case contains additional evidence, unrelated to the defendant's mental health and intellectual disability, that further supports a finding that the defendant lacks rehabilitative potential. As mentioned earlier, the defendant had a lengthy criminal history and demonstrated no remorse for the murder. On the record before us, we cannot find that the defendant's *de facto* life sentence was unconstitutional as applied to him.

¶ 133                                    2. *Abuse of Discretion*

¶ 134    Alternatively, the defendant argues that the court abused its discretion and imposed a sentence that was excessive considering the mitigating evidence he presented. We disagree.

¶ 135    The trial court enjoys a great deal of discretion in determining the appropriate sentence to impose. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We give great deference to the trial court's determination because the trial judge had the opportunity to observe the defendant and the proceedings and was therefore in a better position than we are to weigh the appropriate factors and determine an appropriate sentence. *Id.* at 212-13. We will not overturn a defendant's sentence absent an abuse of the trial court's discretion. *Id.* at 212. An abuse of discretion occurs only if the defendant's sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 136    In this case, the base sentence of 50 years is within the statutorily prescribed range of 20 to 60 years. See 730 ILCS 5/5-4.5-20(a)(1) (West 2016). The 25-year enhancement for use of a firearm is the minimum permitted by statute. See *id.* § 5-8-1(a)(1)(d)(iii). A sentence that falls within the statutorily prescribed range is presumed to be appropriate. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 12. The court carefully considered the mitigating evidence before it. See *Alexander*, 239 Ill. 2d at 213 (finding no abuse of discretion where the record demonstrated that the court considered the appropriate factors). We find no abuse of discretion.

¶ 137                                    III. CONCLUSION

¶ 138    For the foregoing reasons, we affirm the defendant's conviction and sentence.

¶ 139    Affirmed.