**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190425

Order filed November 17, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0425 Circuit No. 17-CF-75 |
| LOUIS A. MOREZ, | ) ) ) | Honorable Thomas W. Cunnington, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Justice Peterson concurred in the judgment.
Justice McDade concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:  (1) Trial court did not abuse its discretion in denying defense counsel's request for a continuance made on the day of trial in response to the State's motion for use immunity for a witness that was disclosed to defendant two years before trial;
(2) Trial court properly denied defendant's motion to suppress the results of his blood alcohol concentration test;
(3) The evidence was sufficient to prove defendant guilty of operating a snowmobile while under the influence of alcohol beyond a reasonable doubt;
(4)  Defendant's 10-year sentence was not excessive; and
(5) Trial court erred in ordering defendant to serve his sentence at 85% rather than 50%.

¶ 2        Following a bench trial, defendant Louis A. Morez was convicted of operating a snowmobile while under the influence of alcohol, resulting in the death of a person, under sections 40/5-7(a)(2) and 40/5-7(e) of the Snowmobile Registration and Safety Act (Snowmobile Act) (625 ILCS 40/5-7(a)(2) (West 2016); id. § 5-7(e)) and sentenced to 10 years in prison. On appeal, he claims that: (1) the trial court erred in denying his request for a continuance; (2) the trial court erred in failing to suppress the results of his blood test; (3) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (4) his sentence was excessive; and (5) the trial court erred in ordering him to serve 85% of his sentence in violation of the truth-in-sentencing statute (730 ILCS 5/3-6-3(a)(2.1) (West 2018)). We affirm in part, reverse in part, and correct the mittimus to reflect the appropriate sentencing credit.

¶ 3                                    I. BACKGROUND

¶ 4        On December 18, 2016, around 8 p.m., defendant, Louis A. Morez, and his friend, Brian Johnson, rode their snowmobiles to a local bar. On the way home, Johnson hit a dip in the trail and his girlfriend, Kristin Argue, who was riding on the back of his sled, fell off. Defendant, following behind Johnson, struck Kristin with his snowmobile, causing her death. A few hours after the accident, officers escorted defendant to the hospital where he signed a warning to motorist form and consented to blood and urine tests. The blood test revealed a blood alcohol concentration (BAC) level of 0.229, and his urine tested positive for cocaine and tetrahydrocannabinol (THC). Defendant was charged with eight counts of operating a snowmobile while under the influence.

¶ 5        Prior to trial, defendant filed a motion to suppress the blood and urine tests. At the hearing, defendant's wife, Tonia Morez, testified that defendant came home that evening and told her there had been a snowmobile accident and that one of the guys told him that he ran over Johnson's girlfriend. Defendant was in shock, but he was not intoxicated. He drank three-fourths of a bottle

of Jägermeister in less than 45 minutes, and then Tonia told him to go to bed. Manteno police officers arrived about an hour later and told Louis that they were "holding him" until the Kankakee County sheriffs' deputies got there. They did not ask any questions.

¶ 6 An hour later, three deputies arrived and informed defendant that they wanted him to go to the hospital to get his blood drawn. Defendant responded, "I'm not going anywhere." Tonia testified that some of the officers were standing over defendant yelling at him. They escorted defendant to the hospital around 11:30 p.m.

¶ 7 Defendant testified that he was in shock after the accident. He went home and told Tonia what had happened and drank more than half a bottle of Jägermeister in less than 20 minutes. Later that night, Tonia woke him up and told him that Manteno police officers wanted to talk to him. Shortly afterwards, two county deputies showed up and told him that he was going to the hospital for blood and urine samples. Defendant kept saying, "no, I'm not," but the officers said that he was going "no matter what." Defendant considered the officers' words to be a threat.

¶ 8 The officers drove defendant to Riverside Hospital, where he consented to the blood and urine tests. Defendant testified that he gave consent at the hospital. Once he arrived at the hospital, officers gave him papers, and he signed them without reading them. Although he was never placed in handcuffs, he believed he was being arrested when the officers escorted him to Riverside Hospital. Defendant admitted that he was intoxicated when he arrived at the hospital, and he admitted to using cocaine and smoking marijuana a few days before the accident.

¶ 9 Emergency room nurse Angie Kimps drew defendant's blood that evening. Kimps specifically asked defendant if he would be willing to submit to blood and urine testing, and he consented. Kimps testified that she told defendant that if he did not consent, she could not draw

3

his blood. When she asked if she could draw his blood, defendant said, "yes." He never claimed that authorities forced him to go to the hospital against his will.

¶ 10    Manteno police officer Brian Lockwood and his partner arrived at defendant's house at 10:50 p.m. in response to reports of a snowmobile accident. Defendant was asleep when they arrived. Tonia woke him up, and "he was staggering" as he walked out into the living room. Lockwood asked defendant if he was involved in a snowmobile accident. Defendant said his friend hit a culvert, and his girlfriend was hurt "really bad." Without provocation, defendant said he was going to jail and was going to have a bad Christmas. Defendant also mentioned that he had been recently laid off. When the deputies arrived, defendant agreed to let them examine the snowmobile. No one was yelling at defendant or threatening him. Defendant was very cooperative. When the deputies left, Lockwood stayed behind and talked to Tonia. She did not mention that defendant had been drinking after he came home.

¶ 11    Deputy Zachary Richmond testified that he went to defendant's home on the night of the accident and spoke to defendant. Defendant appeared to be intoxicated. He slurred his words and told Richmond that he had been drinking. Richmond asked defendant to go to the hospital for blood and urine testing. He denied telling defendant that he had to go even if by force. He stated that he never handcuffed defendant. At no point did he arrest him or threaten him. He testified that defendant willing went to the hospital. At the hospital, defendant never refused to provide a sample. He cooperated fully. Deputy Richmond testified that he read the warning to motorist to defendant "word for word," and defendant signed it. Richmond then identified the warning to motorist form as People's Exhibit No. 2 and verified his signature and defendant's signature at the bottom of the page.

4

¶ 12    At the conclusion of the suppression hearing, the trial court denied defendant's motion. The court found that defendant voluntarily consented at the hospital to the blood and urine tests. The court also found that Tonia was not credible and that defendant did not show that he was so incapacitated that he was unable to consent to the test.

¶ 13    The case was set for trial on three separate occasions: March 12, 2018; September 10, 2018; and January 7, 2019. Each date was continued at defendant's request. On March 7, 2019, the parties appeared before the court and stated that they were ready for trial and that there were no pretrial issues pending. Trial was scheduled for Monday, March 11. On Friday, March 8, the State filed a motion asking the court to grant use immunity to co-defendant Johnson. Defense counsel immediately filed a motion to strike the State's motion, stating that due to the untimeliness of the motion, counsel did not have the "ability to conduct sufficient legal research into the issues brought by the State."

¶ 14    On March 11, before trial commenced, the court held a hearing on the parties' motions. The State argued that there was no surprise or prejudice to defendant because Johnson was listed as witness in its initial discovery report filed on March 16, 2017. The prosecutor stated that the use immunity motion was a preemptive measure in case Johnson invoked his fifth amendment right and that it did not plan to call Johnson as a witness until Wednesday, March 13. Defense counsel argued that it was not foreseeable that Johnson would testify without use immunity and that a successful motion would deny defendant a fair trial and "drastically alter [his] trial strategy." The court granted the State's request for immunity and denied defense counsel's motion to strike.

¶ 15    In response, defense counsel moved for a continuance instanter. Counsel argued that two days was not enough time to prepare for Johnson's testimony because he would be seeking electronic evidence, specifically Facebook posts, which would require subpoenas. The court

5

denied counsel's request. The court noted that there had been a number of continuances granted to defendant in this case, that Johnson had been disclosed as a potential witness in the State's initial disclosure report, and that counsel had a few days to prepare before Johnson would be called to testify. In denying the continuance, the court stated:

> "Because of the age of this case and because of the number of continuances that have been granted in this case for a number of reasons, I don't feel a motion to continue—an oral motion to continue at this point is—is what we should be doing with this case. I—I don't think there is enough surprise here even though—[defense counsel], I understand what you're saying, that you weren't anticipating that without a deal that he would be testifying. Nevertheless, he was disclosed as a witness and anything that—due diligence coming up, [d]efense has had plenty of time to—to look at that."

¶ 16　　　At the bench trial, Johnson testified that on December 18, 2016, around 6 p.m., defendant showed up at his house on a snowmobile. They discussed going snowmobiling, and defendant told Johnson that he was "fucked up." Defendant had on his helmet, and Johnson was not close enough to tell if defendant had alcohol on his breath. They rode to the Manteno Sportsmen's Club and stayed for about half an hour. He could not remember how much alcohol was consumed at the club but testified that he may have had one beer. He did not see defendant have any drinks at the bar. Everyone left the club and decided to go to Edwin's bar. Johnson rode back to his house and picked up his girlfriend, Kristin, and met up with the group at Edwin's. They ordered pizza and drank a few beers. Johnson testified that defendant had a beer and was sitting at the bar with his head down, "slouched down, tired basically." At one point, defendant looked like he was passed out. Johnson tried to talk to him, and defendant told him again that he was "fucked up."

6

¶ 17    The group was at Edwin's for about an hour and left around 9 p.m. Kristin climbed onto the back of Johnson's snowmobile, and defendant followed. On the way back to his house, Johnson hit a bump, and Kristin fell off the back. He stopped and turned around and saw defendant driving his snowmobile right behind her. Then he saw Kristin's helmet rolling into the field. He ran to her and rolled her over. Her eyes were open, but they looked lifeless. Defendant rode back to Johnson and asked him what happened, and Johnson told defendant that he ran over Kristin. Defendant was in shock and began to panic.

¶ 18    Neither Johnson nor defendant had their phones, so Johnson gave defendant his keys and told him to go to his house and call 9-1-1. Johnson loaded Kristin onto his snowmobile and drove back to his house. When he arrived, defendant helped him carry Kristin to the porch. Defendant told Johnson he was sorry but that he had to go, and he left. Johnson's 15-year-old daughter, Haley, called 9-1-1. When the police arrived, Johnson told them that defendant hit Kristin with his snowmobile and that defendant was "hammered." Johnson testified that he believed defendant was drunk by the time he left Edwin's bar.

¶ 19    On cross-examination, Johnson admitted that he did not remember defendant having anything to drink at the Sportsmen's Club but stated that he was not paying attention to what defendant was doing. Defense counsel also introduced a Facebook post from Johnson dated December 22, 2016. Johnson agreed that the post stated, "despite what you all may have heard or will hear[,] we were not out drinking and partying so let's keep the story straight."

¶ 20    Wheaton Gustafson, the bartender at the Sportsmen's Club, testified that defendant and Johnson came in around 7 p.m. He served them a shot of whiskey and a beer, but they did not finish the beer. Gustafson did not believe defendant was intoxicated when he saw him.

¶ 21    Brianna Jajuli and Haley both testified that on the evening of the accident, they were outside Johnson's house waiting for Johnson and Kristin to return when a man rode up on a snowmobile, stumbled up the steps, and tried to unlock the door. He could not open the door. Brianna said the man walked up to the car and told her there had been an accident. He asked her to call 9-1-1. His speech was slurred, but she did not smell any alcohol on his breath. Haley said the man seemed panicked. She assumed he was drunk because he was stumbling. Haley also told the detective who arrived later that the man appeared to be drunk.

¶ 22    Officer Lockwood testified that defendant was sleeping when they arrived at his house an hour after the accident. He woke up and came out of the bedroom staggering. He was unsteady as he tried to put on his clothes. When defendant spoke, his speech was slurred. He voluntarily stated that he was going to jail. Lockwood did not see any alcohol or glasses that he believed had alcohol in them around the house.

¶ 23    Deputy Richmond interviewed defendant at his home that evening. He noticed that defendant had slurred speech and glossy eyes, but he did not see any alcohol in the house. Defendant told him that he and Johnson had been out on the snowmobiles and that he had been drinking. He asked defendant if he would agree to a blood test, and defendant said "yes." He then took defendant to the hospital and read defendant the warning to motorist. Defendant consented and signed the form.

¶ 24    Emergency room nurse Kimps testified that she collected the blood and urine samples. She asked defendant if he was willing to submit to the tests, and he said "yes."

¶ 25    State Police forensic scientist Laura Le Donne analyzed defendant's blood and his BAC level was 0.229. Forensic scientist Henry Rentas analyzed defendant's urine and detected cocaine and THC. He admitted that cocaine and THC can be detected for several days after consumption.

8

¶ 26    Defendant testified on his own behalf. He stated that he rode his snowmobile to the Sportsmen's Club and had one beer at 11 a.m. He left the Sportsmen's Club and returned home around noon, where he had another beer. Around 2:30 p.m. he headed to his brother-in-law's house on his snowmobile where he consumed another beer. He left around 4 p.m. and went to Johnson's house and drank another beer around 5:30 p.m. He testified that he never told Johnson he was "fucked up." Defendant and Johnson then rode to Wesley Swisher's house, and they all rode back to the Sportsmen's Club. There, defendant drank one shot of whiskey and a beer. After the Sportsmen's Club, they rode to Edwin's bar, arriving around 7:30. They stayed for about an hour and ordered pizza, and defendant consumed another beer. Defendant denied that he put his head down on the bar, rested his head on the bar, or passed out at the bar. He also denied that he told Johnson he was "fucked up." He testified that he was not intoxicated when he left Edwin's.

¶ 27    The group left the bar around 8:30 p.m., riding their snowmobiles into white-out conditions and blowing wind. Defendant was following Johnson's snowmobile and then noticed Johnson's brake lights. Defendant passed Johnson and then turned around. When he got back to Johnson, he noticed Kristin lying on the ground. Johnson told defendant that he hit Kristin. Defendant denied hitting anything. Defendant grabbed his phone to call 9-1-1, but it was frozen. Johnson gave him his house keys and told him to go call 9-1-1. At Johnson's house, defendant told the people in the car to call 9-1-1. He saw Johnson coming with Kristin on the snowmobile. He was in shock and did not know what to do. He went home and told his wife there had been an accident. He testified that he then grabbed a bottle of Jägermeister and "slammed it." He drank three-fourths of the bottle and went to bed. On cross-examination, defendant admitted that he had alcohol, cocaine, and cannabis in his system on the night he struck Kristin with his snowmobile.

9

¶ 28 Defendant's wife, Tonia, testified that she called defendant around 8:30 p.m. to make sure he was okay because it was cold outside. He did not sound intoxicated when they spoke. Around 9:30 p.m., defendant returned home and was upset, but did not appear intoxicated. He was walking fine and seemed "perfectly normal." He told her there had been an accident, that Kristin fell off Johnson's snowmobile, and Johnson said defendant ran over her. Defendant told Tonia that he had no idea he hit Kristin. Defendant then consumed three-fourths of a bottle of Jägermeister in 10 to 15 minutes, and she told defendant to go to bed. Around 10:30 p.m., the police arrived and asked to talk to defendant. By that time, defendant was intoxicated. On cross-examination, she said she did not tell officers that defendant had consumed Jägermeister because they did not ask.

¶ 29 Bradley O'Keefe, defendant's brother-in-law, and his wife, Hope O'Keefe, both testified that defendant came to their house around 2:30 p.m. on December 18, 2016, to watch a football game. He had one beer. He did not smell of alcohol, talked normally, and was not intoxicated.

¶ 30 Swisher testified that when defendant arrived at his house that day, he was not intoxicated. He did not notice any unusual speech or the smell of alcohol on defendant's breath. They rode to the Sportsmen's Club for a beer and a shot. Then they rode to Johnson's house to pick up Kristin and rode to Edwin's bar. Swisher said defendant was not drunk when they left Edwin's bar. If defendant seemed drunk to Swisher, he would not have let him get on the snowmobile. Kaydee Doyle, Swisher's girlfriend, also testified that defendant was not intoxicated when they left Edwin's bar but admitted that she was not paying close attention to defendant at the bar.

¶ 31 Dr. James O'Donnell, an expert in pharmacology, testified that according to State police reports, defendant's BAC was 0.229 grams per deciliter at 12:18 a.m., three hours after the accident. Based on the timeline and the number of drinks defendant reported, he calculated that defendant's assumed BAC would have been 0.03 grams per deciliter at the time of the accident.

Dr. O'Donnell based his calculation primarily on toxicology reports, defendant's medical and psychiatric records, and information provided by defendant over the phone.

¶ 32 The trial court found defendant guilty of three counts in the indictment and merged them into count IV, operating a snowmobile while under the influence of alcohol resulting in the death of another person (625 ILCS 40/5-7(a)(2) (West 2016); id. § 5-7(e)). At sentencing, the State argued in aggravation that defendant should be sentenced to the maximum 14-year term based on his three prior convictions for driving under the influence (DUI). The defense presented several character witnesses who all testified that defendant had rehabilitative potential and was remorseful. Defendant testified and asked for forgiveness. The trial court noted defendant's potential for rehabilitation, his active involvement in AA meetings and his commitment to change since the accident. However, the court explained that, given defendant's prior DUI convictions, his rehabilitative potential was speculative. The trial court sentenced defendant to 10 years in prison and denied defendant's motion to reconsider.

¶ 33                                    II. ANALYSIS

¶ 34                            A. Request for a Continuance

¶ 35 Defendant claims that the trial court erred in denying defense counsel's request for a continuance to prepare for the cross-examination of co-defendant Johnson.

¶ 36 The decision to grant or deny a continuance is a matter within the sound discretion of the trial court. *People v. Merritt*, 2017 IL App (2d) 150219, ¶ 22. We will not interfere with the court's decision absent an abuse of discretion. *Id.* An abuse of discretion occurs when the court's decision is arbitrary or unreasonable. *Id.* No "mechanical tests" exist for determining when a denial of a continuance is so arbitrary or unreasonable as to violate due process. *Unger v. Sarafite*, 376 U.S. 575, 589-90 (1964). The court must analyze the circumstances present in a case, which include the

11

reasons presented for the request and the trial court's reasons for denying the continuance. *Id.* In determining whether a continuance is appropriate, courts should consider: (1) the defendant's age; (2) the interests of justice; (3) docket management; (4) judicial economy; and (5) inconvenience to the parties. *Merritt*, 2017 IL App (2d) 150219, ¶ 22. Other factors to consider in criminal cases include: (1) the defendant's right to a speedy, fair, and impartial trial; (2) case history and complexity; (3) the seriousness of the charges; and (4) whether the interest of justice so demands. See *People v. Walker*, 232 Ill. 2d 113, 125 (2009); 725 ILCS 5/114-4 (West 2020). If the denial of a continuance hinders the accused in preparation of his defense, thereby prejudicing his rights, the conviction will be reversed. *People v. Lewis*, 165 Ill. 2d 305, 327 (1995).

¶ 37        Defendant contends that in denying his motion, the trial court abused its discretion because it made no comment regarding the interest of justice, the severity of the case, docket management, inconvenience to the parties, or how much time counsel was requesting. He also alleges that he was prejudiced based on counsel's inadequate performance because counsel did not have the benefit of sufficient research. We disagree.

¶ 38        First, the record does not support defendant's claim that the trial court failed to consider the necessary factors. At the hearing on the State's motion and defense counsel's accompanying continuance request, a lengthy discussion ensued between the parties and the court. The trial court noted the number of continuances granted at defendant's request, and the two-year period in which Johnson had been disclosed as a potential witness. The court also acknowledged the untimeliness of the State's use immunity motion and balanced the potential unfairness to defendant against his lack of due diligence in preparing for Johnson's testimony and the lack of surprise to defendant given the State's initial disclosure in March 2017. In consideration of the circumstances, the court also recognized that defendant had time to prepare for Johnson's testimony, which was scheduled

12

for the end of trial. Thus, the record demonstrates that the trial court considered the relevant factors prior to denying defense counsel's motion to continue, including the facts and circumstances of the case, the interests of justice, the case history, inconvenience to the parties, and defendant's diligence in preparing for trial.

¶ 39        Granting a continuance rests within the trial court's discretion. In this case, the trial court weighed the factors and denied the continuance, concluding that defendant's rights were not infringed upon by a late notice by the State of its intent to grant use immunity to a witness that had been disclosed two years earlier and was scheduled to testify at the end of trial. Given the court's consideration of the circumstances of the case, including defendant's lack of diligence, we cannot say that the denial was so arbitrary as to violate due process.

¶ 40        Defendant relies on *People v. Walker*, 232 Ill. 2d 113 (2009), and maintains that it was an abuse of discretion for the trial court to deny the counsel's request without considering the length of continuance counsel sought or the potential inconvenience to the parties.

¶ 41        In *Walker*, defendant was charged with the June 1992 murders of two individuals and assigned a public defender on July 9, 1992. Defense counsel requested one continuance in August 1993, which the circuit court granted. *Walker*, 232 Ill. 2d at 116. On the morning of trial, the assistance public defender requested another continuance, candidly admitting, "I am not ready to go to trial today." Without conducting a hearing or providing any substantive discussion on the record, the trial court denied her request. The court stated that counsel's reasons for the request were "irrelevant," and the matter proceeded to a bench trial. *Id.* at 117-18.

¶ 42        On review, our supreme court held that the trial court abused its discretion in denying defense counsel's motion to continue by failing to consider the interests of justice, the severity of the charges, the complexity of the case, docket management, judicial economy, inconvenience to

13

the parties, or the length of the requested continuance. *Id.* at 127. In concluding that an abuse of discretion occurred, the court emphasized that the circuit court failed to engage in any thoughtful consideration before "mechanically" denying counsel's request:

> "We hold that the record clearly establishes that the circuit court completely failed to exercise discretion in ruling on defense counsel's request for a continuance of defendant's trial, as it is devoid of evidence showing that the circuit court considered any of the relevant factors in denying the continuance." *Id.* at 126.

The court reprimanded the circuit court, finding that it "completely abdicated its responsibility to conduct an informed deliberation of defense counsel's motion and, instead, immediately and reflexively denied the continuance request on the sole basis that the case had been set for trial." *Id.* at 129. The *Walker* court then held that "in a request for a continuance in a criminal trial is not only a circuit court's discretion as to whether to grant that request, but also a defendant's constitutional right to a fair, procedurally sound trial, which necessitates the making of a sufficient record to establish that a defendant has been afforded a fair process." *Id.*

¶ 43    *Walker* is distinguishable from this case. Here, there is no indication that the trial court abdicated its responsibility to conduct an informed deliberation of the continuance motion. Between the State's motion requesting use immunity and defenses counsel's request for a continuance, the trial court thoroughly discussed the relevant factors with the parties before deciding to deny the continuance motion. Defense counsel was given the opportunity to fully explain his reasoning for requesting a continuance, which included his contention that he was not prepared to cross-examine Johnson. The trial court further inquired as to whether Johnson had been previously disclosed and the State responded that Johnson had been listed as a witness in its initial disclosure. The court then denied defendant's motion, finding that defendant received

14

sufficient notice and that the case had been set for trial numerous times. In this case, unlike the court in *Walker*, the trial court engaged in thoughtful consideration of the specific facts and circumstances and established a sufficient record from which we can determine that defendant was afforded a fair process.

¶ 44        We further find no merit to defendant's argument that defense counsel's performance was inadequate because he did not have enough time to prepare. Although Johnson might not have been willing to testify, nothing in the record indicates that Johnson would not testify without use immunity. Johnson was disclosed on the State's initial list of witnesses and counsel had two years prior to trial to investigate his involvement, conduct interviews, and prepare a defense strategy. See *Merritt*, 2017 IL App (2d) 150219, ¶ 32 (trial court did not abuse its discretion in denying the continuance motion because defendant was not diligent in pursuing his claim). In addition, defense counsel's trial examination of Johnson was not inadequate; it was thorough and exhaustive. During Johnson's cross-examination, counsel used the Facebook post to discredit Johnson and bolster defendant's theory that he had not been out drinking and partying. Defense counsel also extensively cross-examined Johnson about being granted use immunity and whether the State made any promises in exchange for his testimony. In closing arguments, counsel further argued that Johnson's testimony should not be believed. He noted that Johnson was granted use immunity, that he was a co-defendant in this trial, that he had a civil suit filed against him because of the accident, and that he was trying to shift the blame for Kristin's death to defendant. Thus, a review of the record demonstrates that defense counsel's trial performance regarding Johnson was not inadequate.

¶ 45                                B. Suppression of Defendant's BAC

15

¶ 46 Defendant maintains that the trial court erred in denying his motion to suppress the results of his blood test performed at the hospital. He claims that due to the custodial nature in which he was taken to the hospital and his level of intoxication, his consent at the hospital was not voluntary. Defendant admits that he failed to raise this issue in his posttrial motion but urges us to consider it on constitutional grounds or ineffective assistance of counsel grounds.

¶ 47 In this case, defendant properly preserved his claim of constitutional error by filing a motion to suppress. See *People v. Cregan*, 2014 IL 113600, ¶ 16 ("a criminal defendant properly preserves a constitutional error by objecting to that error at trial, even if his defense attorney fails to include that error in a motion for a new trial"). The Illinois Supreme Court has recognized that constitutional issues that have been raised at trial and that *may* be raised in a postconviction petition are not subject to forfeiture. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988). Defendant's motion to suppress asserted a violation of his fourth amendment right to be free from unreasonable searches and seizures. Accordingly, we will review the merits of defendant's claim under the constitutional issue exception to forfeiture.

¶ 48 Where a defendant files a motion to quash his arrest and suppress evidence, claiming there was an illegal search or seizure, he or she has the burden of demonstrating a fourth amendment violation. *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 34. Once the defendant properly raises the suppression issue, the burden shifts to the State to prove that the challenged evidence is admissible. *People v. Ortiz*, 317 Ill. App. 3d 212, 222 (2000). A trial court's findings of fact on a motion to suppress will not be disturbed unless they are against the manifest weight of the evidence. *People v. Wells*, 273 Ill. App. 3d 349, 351 (1995).

¶ 49 The fourth amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV.

16

"[A] warrantless search of the person is reasonable only if it falls within a recognized exception." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). One exception to the warrant requirement is voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "Consent to a blood test need only be voluntary in order to provide a valid basis for an exception to the warrant requirement." *People v. Harris*, 2015 IL App (4th) 140696, ¶ 49. Consent, however, must be received voluntarily and not obtained through implied threats or covert force. *People v Anthony*, 198 Ill. 2d 194, 202 (2001).

¶ 50    A court must look at the totality of the circumstances in determining whether consent was voluntarily given. *Id.* Consent is involuntary if "[the defendant's] will has been overborne and his capacity for self-determination critically impaired." *Schneckloth,* 412 U.S. at 225 "[C]ustody alone does not render consent involuntary." *People v. Alvarado*, 268 Ill. App. 3d 459, 464 (1994). Factors to consider include the length of detention and whether defendant was advised of his constitutional rights. *People v. Brown*, 169 Ill. 2d 132, 144 (1996). Additional factors include: (1) whether police used force; (2) whether police used custody to make repeated requests for consent; and (3) whether police used custody as leverage to obtain consent. *Harris*, 2015 IL App (4th) 140696, ¶ 49.

¶ 51    Here, the trial court's finding that defendant's consent was voluntary was not against the manifest weight of the evidence. Deputy Richmond testified that defendant agreed, without force, to submit to a blood test at his home, without the use of police force. When defendant arrived at the hospital, he again consented to blood and urine testing. Deputy Richmond read the consent form to defendant, and defendant signed the form voluntarily. The emergency room nurse further testified that defendant said, "yes," when she asked for permission to draw his blood. He did not indicate that police had forced him to submit to the BAC test or used leverage to coerce his

17

participation. In addition, defendant admitted during the suppression hearing that he provided consent to Nurse Kimps and that he voluntarily signed the consent form at the hospital.

¶ 52 Although defendant and his wife testified that several officers were present in their home and that defendant was forced to go to the hospital, other evidence contradicted their statements and challenged their credibility. Officer Lockwood and Deputy Richmond both testified that no one threatened defendant, placed hands on him, or restrained him in any way. Deputy Richmond also testified that as soon as they arrived at the hospital, he advised defendant of his rights and defendant voluntarily signed the warning to motorist form in which he consented to the BAC test. Proof of defendant's consent was further corroborated by the admission of the signed consent form at trial. See *Harris*, 2015 IL App (4th) 140696, ¶ 51 (warnings on the signed form clearly indicated a choice between consenting to testing and withdrawing consent to testing).

¶ 53 Finally, while defendant argues on appeal that he was too intoxicated to voluntarily give consent, no testimony was provided by defendant or any other witness that he was unable to understand the procedures at the hospital or the officers' questions when they arrived at his home. As the trial court noted in denying the suppression motion, "[n]either the defendant nor his wife nor the police officers nor the nurse testified that defendant was so intoxicated or drugged to the extent that his capacity to make decisions was critically impaired."

¶ 54 Based on the totality of the circumstances, the trial court's finding that defendant gave his consent voluntarily was not against the manifest weight of the evidence. Defendant's motion to suppress the blood test was properly denied.

¶ 55 C. Sufficiency of the Evidence

¶ 56 Next, defendant claims that we should reverse his conviction for operating a snowmobile while under the influence of alcohol pursuant to sections 40/5-7(a)(2) and 40/5-7(e) of the

18

Snowmobile Act (625 ILCS 40/5-7(a)(2) (West 2016); *id.* § 5-7(e)) because the State failed to prove that he was under the influence of alcohol while operating a snowmobile beyond a reasonable doubt.

¶ 57   A reviewing court will not overturn the fact finder's verdict unless it is so unreasonable, improbable, and unsatisfactory as to leave reasonable doubt regarding the defendant's guilt. *People v. Brown*, 169 Ill. 2d 132, 152 (1996). It is not the function of the reviewing court to retry a defendant when presented with a challenge to the sufficiency of the evidence. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the responsibility of the trier of fact to determine the credibility of witnesses, weigh their testimony, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The testimony of even a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.* To prove guilt beyond a reasonable doubt does not mean that the trier of fact must disregard the inferences that normal flow from the evidence before it. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005).

¶ 58   Defendant was convicted of count IV of the indictment as charged under sections 40/5-7(a)(2) and 40/5-7(e) of the Snowmobile Act. To prove a violation of those statutory provisions, the State must show that: (1) the defendant was operating a snowmobile; (2) the defendant was under the influence of alcohol; and (3) the defendant's operation of a snowmobile while under the influence of alcohol caused a person's death. 625 ILCS 40/5-7(a)(2) (West 2016); *id.* 5-7(e). "A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his

19

mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." Illinois Pattern Jury Instructions, Criminal, No. 23.29 (approved July 18, 2014).

¶ 59    At trial, numerous witnesses testified that they observed defendant drinking prior to the accident and witnessed behavior that led them to believe he was under the influence of alcohol at the time of the accident. Johnson told officers that defendant was "hammered" when he hit Kristin. He testified that when he told defendant he struck Kristin, defendant was in disbelief. He was not even aware that he hit her. Tonia also testified that defendant was not aware that he hit Kristin until Johnson told him. Johnson, Haley, and Brianna also testified that defendant exhibited physical characteristics of intoxication immediately before and after the accident. He was falling asleep at the bar, he staggered when he walked, his speech was slurred, and he was unable to unlock the door to Johnson's house. Defendant's testimony supported their observations. He testified that he drank six beers that day, consuming at least two beers and a shot of whiskey shortly before 8:30 p.m. He also admitted that he had alcohol, cannabis, and cocaine in his system when he struck Kristin while driving his snowmobile behind Johnson. He further testified that he did not realize he hit Kristen with his snowmobile even though he struck her with enough force to remove her helmet. Based on this evidence, a rational trier of fact could have found defendant was operating his snowmobile while under the influence of alcohol when he caused Kristin's death. The evidence was sufficient to find guilt beyond a reasonable doubt on count IV.

¶ 60    Defendant attempts to discredit Johnson's testimony, arguing that he was a biased witness whose testimony was contradicted by other witnesses. For instance, defendant notes that the bartender at the Sportsmen's Club testified that defendant was not intoxicated prior to the accident, defendant's wife testified that he did not seem intoxicated prior to the accident, and Swisher and Doyle testified that he did not appear drunk when they left Edwin's bar. However, some of these

20

same witnesses testified that defendant had been drinking prior to the accident, and they all spent much less time with defendant before the accident than Johnson. Defendant's wife was not traveling with the snowmobile group that day, and Doyle testified that she did not pay attention to defendant when they were at Edwin's bar.

¶ 61 Moreover, defendant's claim that Johnson's biased testimony resulted in an unreliable verdict is unavailing where, as here, the record reveals that the potential for bias was revealed and discussed at trial. See, *e.g.*, *People v. Kliner*, 185 Ill. 2d 81, 134-35 (1998) (admission of testimony subject to harmless error analysis and was not reversible where trier of fact was advised of potential bias against defendant through other witnesses and information provided at trial). Johnson testified that the State granted him use immunity. He also testified that he had not been promised anything in exchange for his testimony and that no promises were made that the State would be more lenient in its case against him. Defense counsel also cross-examined Johnson vigorously, asking him numerous questions about the State's grant of use immunity and questioning whether any deals had been made in exchange for his testimony. In addition, defense counsel asked Johnson about his pending felony charges for possession of a controlled substance and confirmed that the administrator of Kristin's estate had filed a civil claim against him.

¶ 62 Further, contradictory testimony does not necessarily destroy the credibility of a witness. See *People v. Gray*, 2017 IL 120958, ¶ 47 (trier of fact charged with deciding how flaws in a witness's testimony affect his or her credibility as a whole and minor discrepancies affect only its weight). Although Johnson's testimony regarding the amount of alcohol he consumed that day varied slightly, there is nothing in the record to indicate that Johnson was a biased witness or that any inconsistencies in his testimony were so significant that they rendered his account of defendant's drinking and behavior that day incredible. After hearing Johnson's testimony and

21

weighing the discrepancies, the trier of fact determined that Johnson's testimony was credible. It is well-settled that the trier of fact is in the best position to determine credibility and weigh witness bias, and it is not our place to second guess those determinations without an obvious reason to do so. Based on Johnson's testimony and the testimony of other witnesses, it was reasonable for the trial court to conclude that defendant was under the influence of alcohol when he struck Kristin with his snowmobile.

¶ 63    Defendant also argues that his alcohol level at the time of the blood test was not indicative of his alcohol level at the time the accident happened. He claims that the three-hour delay between the incident and the test and his continued consumption of alcohol when he returned home after the accident resulted in a BAC test result that was not probative of his intoxication when he hit Kristin. He also claims that his own expert testified that defendant's extrapolated BAC level at the time of the accident was 0.03 grams per deciliter. Therefore, the results of his blood test hours later provide little evidence that he was under the influence of alcohol when he struck Kristin. Again, it was the trier of fact's job to weigh Dr. O'Donnell's testimony against the testimony of the other witnesses and the blood test. Regardless of Dr. O'Donnell's extrapolation, additional evidence existed from which a reasonable trier of fact could infer that defendant was under the influence of alcohol at the time of the accident.

¶ 64    Here, none of the issues raised by defendant create a reasonable doubt. Evidence at trial established that defendant was drinking prior to the accident, that he did not realize he hit Kristin, that he was exhibiting characteristics of being under the influence of alcohol shortly before and immediately after the accident, that he had alcohol in his system after the accident and that his BAC level was 0.229 based on a blood test conducted three hours after the accident. Reviewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could have

22

found defendant guilty of operating a snowmobile while under the influence of alcohol resulting in the death of a person beyond a reasonable doubt.

¶ 65                                   D. Excessive Sentence

¶ 66        Defendant also argues that his 10-year term of imprisonment is excessive. He contends that his lack of recent criminal history, his remorse, and his potential for rehabilitation should have resulted in a more lenient sentence.

¶ 67        In sentencing a defendant, the trial court must balance the punitive and rehabilitative purposes of punishment, which "requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana,* 332 Ill. App. 3d 96, 109 (2002).

¶ 68        The trial court has broad discretion in imposing sentence, and its sentencing decision is entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because "the trial court is generally in a better position than the reviewing court to determine the appropriate sentence." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The sentencing court has the opportunity to weigh the factors in aggravation and mitigation. *Id.* Accordingly, we must not substitute our judgment for that of the trial court merely because we would have weighed the factors differently. *Id.*

¶ 69        We will not alter a defendant's sentence on review absent an abuse of discretion by the trial court. *Id.* at 209-10. A sentence is an abuse of discretion if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

23

¶ 70    Defendant acknowledges that his offense was serious but claims that a sentence reduction is appropriate because the trial court failed to give adequate weight to the mitigating factors such as his lack of recent criminal history, his remorse, and his rehabilitative potential. Defendant, however, fails to cite any portion of the record indicating that the trial court did not adequately consider these factors. The trial court found that defendant's criminal history was a prominent aggravating factor in fashioning an appropriate sentence given that he committed three prior offenses for driving under the influence and that the current offense resulted in Kristin's death. The record also shows that the trial court took defendant's expressed remorse into consideration, as well as his potential to be rehabilitated, and determined the appropriate weight to attribute to the aggravating and mitigating evidence. See *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993) (trial court has discretion to decide weight accorded to mitigating evidence).

¶ 71    Under section 40/5-7(e) of the Snowmobile Act, defendant's potential sentence ranged from 3 to 14 years. See 625 ILCS 40/5-7(e) (West 2016) (causing another person's death while operating a snowmobile under the influence of alcohol is a Class 2 felony subject to a term of 3 to 14 years in prison). Defendant's sentence fell within the prescribed statutory range and was not an abuse of discretion merely because the trial court found the factors in aggravation outweighed those in mitigation. See *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 136 ("sentence that falls within the statutorily prescribed range is presumed to be appropriate").

¶ 72                        E. Application of Truth-In-Sentencing Statute

¶ 73    Last, defendant argues that the trial court erred in ordering him to serve his sentence at 85%, rather than 50%. The State confesses error, and we agree.

¶ 74    Except as otherwise provided by statute, "a prisoner who is serving a term of imprisonment shall receive one day of sentence credit for each day of his or her sentence of imprisonment." 730

24

ILCS 5/3-6-3(a)(2.1) (West 2018). Section 5/3-6-3(a)(2.1) of the truth-in-sentencing statute provides that for all offenses that are not explicitly listed or otherwise expressly enumerated within the statute, the defendant shall receive the opportunity to accrue day-for-day credit against his or her sentence. *Id.* Operating a snowmobile while under the influence of alcohol or other drugs or intoxicating compounds pursuant to section 40/5-7 of the Snowmobile Act (625 ILCS 40/5-7 (West 2016)) is not one of the excluded offenses listed in section 5/3-6-3(a)(2.1) or expressly enumerated elsewhere in the truth-in-sentencing statute. See, *e.g.*, 730 ILCS 5/3-6-3 (West 2018); *id.* § 3-6-3(a)(2.1). Accordingly, defendant is eligible for day-for-day credit, and the trial court committed plain error in ordering him to serve 85 percent of his sentence. See *People v Loggins*, 2019 IL App (1st) 160482, ¶ 127 (misapplication of truth-in-sentencing statute amounted to plain error because it affected the defendant's fundamental right to liberty). We therefore correct defendant's mittimus to reflect that he is eligible to receive day-for-day credit and qualifies for opportunity for release after serving 50% of his sentence. See Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967); *Loggins*, 2019 IL App (1st) 160482, ¶ 128 (reviewing court may correct mittimus without ordering remand).

¶ 75                                    III. CONCLUSION

¶ 76        We affirm defendant's conviction and sentence. We reverse the circuit court's order requiring defendant to serve his sentence at 85%, rather than 50%, and we correct the mittimus accordingly.

¶ 77        Affirmed in part and reverse in part; mittimus corrected.

¶ 78        JUSTICE McDADE, concurring in part and dissenting in part:

¶ 79        The majority has set out in the first paragraph of the Order its finding on each of the issues raised by defendant in this case, affirming all except the trial court's erroneous designation of the

sentencing credit for which defendant was eligible. For the reasons that follow, I disagree with the findings enumerated (1), (3), and (5), and respectfully dissent from them.

¶ 80        The trial in this case was scheduled to begin on Monday, March 11, 2019. This was the fourth trial date and each prior setting had been continued at defendant's request. On Thursday, March 7, the parties appeared and both defendant and the State advised the court they were ready for trial. The State did not request use immunity for its most damning witness, Brian Johnson, at that time. Had it done so, the decision on whether it would be granted might have been made Friday, giving the defense attorney at least the weekend to adjust. But it did not. Instead, on Friday, March 8, the State filed a motion requesting use immunity for Johnson. The earliest defense counsel's objection arguing untimeliness could be heard was the morning trial was scheduled to begin. After hearing arguments, the trial court allowed the use immunity. Defense counsel then moved for a continuance asserting he was no longer prepared to cross-examine Johnson. The trial court denied counsel the continuance. I would find this decision to be an abuse of the trial court's discretion, vacate defendant's conviction, and remand for a new trial.

¶ 81        At the beginning of the court day on March 11, Johnson and Morez were co-defendants; both had been criminally charged in connection with the death of Kristin Argue. Johnson was also the only witness claiming, on a persuasive basis, that defendant was intoxicated *at the time of the accident.*[1] Every other person who had significant contact with defendant during that afternoon and evening, as well as defendant's wife who spoke with him by phone and defendant himself,

---

[1] Johnson's daughter, Hayley, age 15, and her friend, Brianna, both testified that defendant appeared drunk to them. Collectively they attributed that conclusion to his inability to open Johnson's front door, stumbling, appearing panicked, and slurring his request that they call 911. Neither smelled alcohol on or about him. Their other observations are equally attributable to his having just learned that he had struck Kristin with his snowmobile and she was badly injured and the fact that it was so cold that his cellphone would not work, Sheriff Officer Bertrand's camera would not operate, and Johnson had to kick open his door because he did not have his keys and he could not feel his hands.

said he was not intoxicated at any time prior to the accident or at the time it occurred. The State's entire case depended on who won the credibility contest between defendant and Johnson.

¶ 82 The extension of use immunity gave Johnson a giant boost toward winning that contest. He had been officially and functionally acquitted of any wrongdoing to which he testified. In several significant and relevant respects, the Brian Johnson previously disclosed as a witness by the State and the Brian Johnson who testified at trial were two different people. Defense counsel's preparation for Johnson, fellow offender and co-defendant, would be worthless as to Johnson, innocent bystander. First, there was now no possibility that Johnson could refuse to testify, eliminating the opportunity to highlight his reluctance to submit his credibility to the scrutiny of the fact-finder. Second, defense counsel had been stripped of the opportunity to make Johnson appear evasive and shifty and untruthful on cross-examination or to maneuver him into exercising his fifth amendment right not to incriminate himself. Rather than having to weigh the potential impact of each answer to assess whether to answer or assert his fifth amendment rights, Johnson could now answer promptly without any vacillation or appearance of equivocation, and with apparent complete candor. He could testify with the ease and confidence of a person unconcerned about any possible negative ramifications of his own culpability because that was who he had been allowed to become by virtue of the use immunity. The impact would be even more damaging if this had been a jury trial; still, the "trial court" is a human being and is fully capable of being impressed by a candid and forthcoming witness with nothing to lose and therefore nothing to hide.

¶ 83 Johnson's gift of use immunity represented a seismic change in his vulnerability and believability on cross examination and would require a corresponding change of tactics by defense counsel in approaching the newly exculpated witness.

27

¶ 84        The State sandbagged the defense. The trial court decided defendant's attorney could find time in already-planned court days to work out a major course-correction for cross-examining the State's most important witness and denied the requested continuance. I would find that decision was error, was an abuse of the court's discretion, and denied defendant a fair trial. As a consequence, I would further find that defendant's conviction and sentence must be vacated and the matter remanded for further proceedings.